**Joseph C. Peiffer (admitted *pro hac vice*)**
E-Mail:  jpeiffer@prwlegal.com
PEIFFER ROSCA WOLF ABDULLAH CARR & KANE
201 St. Charles Ave., Suite 4610
New Orleans, LA 70170
Telephone No.: (504) 523-2434
Facsimile No.: (504) 523-2464

**Daren A. Luma (admitted *pro hac vice*)**
E-Mail:  dluma@lumalegal.com
DAREN A. LUMA, PLLC
75 South Broadway, Suite 400
White Plains, NY 10601
Telephone No.: (914) 304-4051
Facsimile No.: (914) 206-5353

**Charles J. Paternoster**, OSB #024186
E-Mail Address: cpaternoster@pfglaw.com
PARSONS FARNELL & GREIN, LLP
Attorneys at Law
1030 SW Morrison Street
Portland, OR 97205
Telephone No.: (503) 222-1812
Facsimile No.: (503) 274-7979

Attorneys For Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| HARRY AND UNNA ALBERS, TRUSTEES, ) | |
| HARRY AND UNNA ALBERS FAMILY TRUST; ) | |
| KAREN ANDERSON; ) | |
| JEAN ANDREIKO; ) | |
| JODY ANDREIKO-ODEGARD; ) | Case No.: 3:16-cv-02239-AC |
| SCOTT ANDREIKO, TRUSTEE, SCOTT ) | |
| ANDREIKO I 401(K) PLAN PSP; ) | SECOND CORRECTED SECOND |
| FRANCIS AND BETTY FLAIM, TRUSTEES, ) | AMENDED COMPLAINT |
| FLAIM REVOCABLE TRUST; ) | |
| JOANN FLAIM, TRUSTEE, THE BRADLEY ) | |
| DAUGHTER 2006 REVOCABLE LIVING ) | JURY TRIAL REQUESTED |
| TRUST; ) | |
| STEPHEN FLAIM, TRUSTEE, FLAIM 1998 ) | |
| FAMILY TRUST; ) | |

Page    1 – SECOND CORRECTED SECOND AMENDED COMPLAINT

STEPHEN FLAIM;                                          )
STEPHEN FLAIM, TRUSTEE, JOHN G.                         )
WATSON FOUNDATION INC., LLC;                            )
LARRY GOLDSTEIN AND NANCY WIEDLIN;                      )
PAUL HEATH;                                             )
THOMAS AND SARAJEAN HERRMANN;                           )
COLLEEN HOBLIT;                                         )
DAVID JACKSON;                                          )
GREG LEWIS AND MARY JACKSON;                            )
ROBERT MANLY;                                           )
ANNE MCCAMMON;                                          )
DONALD MCGEE;                                           )
WILLIAM OLHAUSEN;                                       )
WILLIAM AND DONA OLHAUSEN, TRUSTEES,                    )
OLHAUSEN FAMILY TRUST;                                  )
CAROL PAQUETTE;                                         )
GABRIELA PARENTE, TRUSTEE, M. GABRIELA                  )
PARENTE FAMILY TRUST;                                   )
BEATRICE RECTOR, TRUSTEE, BEATRICE                      )
RECTOR REVOCABLE LIVING TRUST;                          )
RICK REHAN, TRUSTEE, THE REHAN FAMILY                   )
1990 TRUST;                                             )
MICHAEL STEVENSON;                                      )
ANNE AND GEORGE STOLL, TRUSTEES,                        )
THE STOLL TRUST;                                        )
WILLIAM TYSON;                                          )
GREG VANDUZER;                                          )
RAHEL ABRAHAM;                                          )
VIRGINIA ADAMS;                                         )
RICHARD ADER;                                           )
PAUL AND ERNESTINE ALLEN,                               )
PETER ANDERSON AND SUSAN                                )
ROESELER, jointly, and SUSAN                            )
ROESELER individually;                                  )
LEIGH ANNE HADLEY AND KARL                              )
BALZER, jointly, and LEIGH ANNE HADLEY                  )
individually;                                           )
JAMES BARBER, TRUSTEE, JAMES AND EMMA                   )
BARBER MARITAL TRUST;                                   )
STEVEN BEAIRD;                                          )
GREGORY AND BARBARA BERGERE                             )
MURALDHARAN BHOOPATHY AND                               )
AMUDHA SUNDARAMURTHY,                                   )
ROSANNA BOULTON;                                        )
PHIL BOULTON;                                           )
STEVE BOYD, TRUSTEE, SABELLA BOYD                       )
FAMILY TRUST; LAURA BRACKENRIDGE;                       )
JOHN BRILL;                                             )

ALVAN BROWN;                                        )
EDWARD BULGER, TRUSTEE, BULGER                      )
LIVING TRUST; EDWARD BULGER,                        )
DAN AND SUSAN BUREAU;                               )
JOEL BUSHMAN;                                       )
KIM CALDWELL;                                       )
ANGELA CHEEK;                                       )
DAVID CHEEK;                                        )
KEVIN CHEN, TRUSTEE, JOY CAPITAL, LLC;             )
KEVIN CHEN, TRUSTEE, LIAN SHAO;                     )
CHU-TIEN CHIA;                                      )
SHEUNG CHOW AND WING-HUNG YAN;                      )
JEFFREY AND RONNI COHEN;                            )
KARRA CRAWFORD;                                     )
TIMOTHY CUSTER;                                     )
ALEXANDER MEMORAN DADGAR;                           )
ALI DADGAR AND FARIBA RONNASI, jointly             )
and each individually; ERNEST AND PAIGE            )
DANTINI;                                            )
TUAN DAO, as owner BAY36 PARTNERS LLC;             )
JUDY DELAROSE;                                      )
KAM AND PARISA DERAKSHANI;                          )
GURCHARAN K. DHALIWAL;                              )
BARBARA DOWNS;                                      )
DAVID EIDE;                                         )
PEGGY EIDE;                                         )
GARY AND KATHLEEN ETCHELLS, jointly                )
and KATHLEEN ETCHELLS, individually;               )
RUDOLPH FALLER, TRUSTEE, RUDOLPH A.                 )
FALLER LIVING TRUST UA 7/13/1993;                  )
RUDOLPH FALLER, TRUSTEE, CYRENA                     )
FALLER TRUST;                                       )
VINCENT B. FERNANDES;                              )
JUDY FLEXER;                                        )
KEN FLEXER;                                         )
DAVID FONTANA;                                      )
RYAN FOX;                                           )
LINDA GILSON;                                       )
JOHN GONNELLA;                                      )
CAROL GONNELLA;                                     )
JOHN GOULD, JR., EXECUTOR, ESTATE OF               )
JOHN V. GOULD; JOHN GOULD, JR.;                     )
SALLY GOULD;                                        )
TERRANCE GRIER, TRUSTEE, TERRANCE M.               )
AND DIANE M. GRIER TRUST 12/27/2010;               )
DAVID WHITNEY AND RUTH WHITNEY,                     )
TRUSTEES, EDITH GROBE FOUNDATION;                   )
BRUCE HALE;                                         )

Page    3 – SECOND CORRECTED SECOND AMENDED COMPLAINT

JOHN HALLER;                                          )
JOHN HALLER, TRUSTEE, FRANKLIN M.                     )
HENRY MARITAL TRUST;                                  )
DAVID HARRIS;                                         )
JAMES HARVEY, TRUSTEE, HARVEY                         )
REVOCABLE TRUST;                                      )
DONALD HAUGE;                                         )
MAX ANTON HERDE;                                      )
CHARLES EDWARD HUGGINS III;                           )
ROLLIE HUNT, TRUSTEE, STRAND HUNT                     )
CONSTRUCTION;                                         )
DANIEL JOHANSEN, TRUSTEE, JOHANSEN                    )
FAMILY SURVIVORS TRUST U/A DTD                        )
2/01/1993 AND JOHANSEN CREDIT SHELTER                 )
TRUST U/A DTD 2/01/1993;                              )
ARASH KABIR AND SANA PARSIAN;                         )
ARMIN KABIR AND MINA LOGHAVI, jointly                 )
and ARMIN KABIR, individually;                        )
VICTORIA AND GREGORY KARPSTEIN;                       )
KELLY KIM;                                            )
ROSS AND LORRELLE KLINGER;                            )
ROBERT KLINK;                                         )
PATRICIA KLINK;                                       )
ROBERT AND RENEE KOCH, TRUSTEES,                      )
THE RENEE C. KOCH LIVING TRUST AND                   )
THE ROBERT H. KOCH LIVING TRUST;                     )
ROBERT KOCH;                                          )
KEVIN KORPI;                                          )
WEN LACASSE;                                          )
CLIFFORD AND MYRNA LAYCOCK,                           )
TRUSTEES, CLIFFORD AND MYRNA                          )
LAYCOCK FAMILY TRUST;                                 )
ANN ELIZABETH LECLAIR;                                )
MARK LECLAIR;                                         )
IRVING LEVINSON;                                      )
ROBERT LEVINSON;                                      )
MECHELE LIMBAUGH;                                     )
TONY LIMBAUGH, JR., AS POWER OF ATTORNEY              )
for TONY LIMBAUGH SR. AND LOLA                        )
LIMBAUGH; JAMES LIVERMORE;                            )
BRAD LUNDBERG;                                        )
DEBORAH MALONEY;                                      )
SEAN AND JONI MAYER;                                  )
KARIN MCGINN;                                         )
JOHN MCGINN;                                          )
JOHN MCKENNA;                                         )
CATHERINE MOELLER;                                    )
EDWARD MOORE;                                         )

Page   4 – SECOND CORRECTED SECOND AMENDED COMPLAINT

MEHRDAD NAEINI AND SHAHRZAD AMINI;  )
JOSEPH AND KELA NESS;                )
MARY NICHOLSON;                      )
DONALD NORTON;                       )
HEIDI OWENS;                         )
MARY T. PETERSON, TRUSTEE, MARY T.   )
PETERSON REVOCABLE TRUST;            )
SUDHA PIDIKITI AND VIKRAM            )
YEMULAPALLI;                         )
EMILY QUAN;                          )
DONALD RAMSTHEL;                     )
SHEILA HEIMBACH; MITCHELL HEIMBACH;  )
PAIGE HEIMBACH;                      )
SHEILA HEIMBACH, TRUSTEE, THE LALEH  )
RAMSTHEL REVOCABLE TRUST;            )
ANTHONY RAVANI;                      )
EDNA READ;                           )
PATRICIA REBNE;                      )
JOHN REDL;                           )
OWEN REESE JR;                       )
DAN REINER;                          )
JERI MORGAN REINER;                  )
ALLEN AND SUSAN REITER;              )
SUSAN REITER, TRUSTEE, JOSEPH E.     )
FELDMAN TRUST FBO UA 6/15/1984;      )
ALLEN RHYASEN;                       )
RAYMOND RINGERING;                   )
SUSAN SABELLA;                       )
KEN SCHREIER;                        )
BEHROUZ AND FARIBA SHOKRI, jointly and )
BEHROUZ SHOKRI, individually;        )
GARY SIMPSON;                        )
DAVID AND POLLY SKONE;               )
LAKSHMI SRINIVASAN AND K.S.          )
VENKATRAMAN;                         )
CHRISTOPHER STAHL;                   )
TIM STARKEY;                         )
JAMES AND DEVON SURGENT, jointly and )
DEVON SURGENT, individually;         )
MARLA AND GEORGE SURGENT;            )
LAURIE SYLLA;                        )
SITA VASHEE;                         )
VIJAYKUMAR VASHEE, TRUSTEE, VASHEE   )
FAMILY LIMITED PARTNERSHIP;          )
VIJAYKUMAR VASHEE; DONALD VERKEST;   )
LINDA WALL;                          )
DAVID WHITNEY, TRUSTEE, WHITNEY      )
LIVING TRUST;                        )

Page    5 – SECOND CORRECTED SECOND AMENDED COMPLAINT

DAVID WHITNEY;                                      )
PHILIP WIDMER;                                      )
MAUREEN WIMBISCUS, TRUSTEE, MAUREEN  )
 A. WIMBISCUS TRUST;                                )
KYLE YAKABU;                                        )
FAROKH AND GEETI YAZDANI;                          )
MARY T. PETERSON, TRUSTEE, MARY T.            )
 PETERSON REVOCABLE TRUST;                         )
CHRISTOPHER J.N. TOWER, AS DIRECTOR OF,  )
GALENA INVESTMENTS, INC.;                          )
LESLIE FERRONE;                                    )
RICHARD AND JENNIFER MONAHAN,                      )
TRUSTEES, MONAHAN LIVING TRUST;                    )
DONALD SEARCY, TRUSTEE, ELIZABETH            )
ANNE TRUST; and                                    )
KATHLEEN SEARCY, TRUSTEE KATHLEEN            )
M. SEARCY TRUST.                                   )
                                                   )
            *Plaintiffs*,                          )
                                                   )
v.                                                 )
                                                   )
DELOITTE & TOUCHE LLP;                             )
SIDLEY AUSTIN LLP,                                 )
TONKON TORP LLP; and                              )
INTEGRITY BANK & TRUST                            )
                                                   )
            *Defendants.*                          )
_____)

 

 

        Plaintiffs allege the following upon personal knowledge as to themselves and their own

acts, and as to all other matters upon information and belief, based upon the investigation made

by and through their attorneys.  The Corrected Second Amended Complaint lists the complete

names of all plaintiffs and defendants in this matter, where the previous Second Amended

Complaint referenced only the first plaintiff and first defendant named in the case.  The Second

Corrected Second Amended Complaint removes the words "Class Action" from the pleading

title.

///

///

## INTRODUCTION

1.      The Aequitas companies sold securities through their "Private Notes" program and various Aequitas funds and other investment vehicles. At the end of 2015, more than 1,500 investors were owed more than $600 million on the securities they purchased from Aequitas. The Aequitas Securities, including the Aequitas Income Opportunity Fund II, LLC ("AIOF-II") securities at issue in this action, were sold in violation of the Oregon Securities Law and were not registered in compliance with Oregon law. Further, Aequitas sold its securities, including the AIOF-II securities, by means of untrue statements of material fact and omissions of material facts. Aequitas' auditing firm, Deloitte & Touche LLP, and Aequitas' law firms, Sidley Austin LLP and Tonkon Torp LLP, participated and aided in these unlawful sales. Integrity Bank & Trust also participated in, aided in and successfully solicited these unlawful sales. As a result, Defendants are jointly and severally liable to return to Plaintiffs the money they paid for these securities, plus interest at the rate stated in the security or 9 percent, whichever is greater.

2.      The misrepresentations and omissions by Aequitas were extensive and pervasive. The investments were represented to be secure, stable, and liquid. Aequitas emphasized "strong asset coverage," and investors were told that the value of the Aequitas collateral backing their securities substantially exceeded the collective amount owed to security holders. Aequitas represented that it had taken additional steps to reduce risk, including securing guarantees and recourse agreements and monitoring the assets on a monthly basis. Investors were told that the money they invested would be used to purchase "stable" and valuable assets, primarily consisting of hospital and education receivables, from "financially strong institutions." Aequitas represented that it maintained "an independent 'Conflicts Review Committee' to review and render opinions on" all inter-company transactions. Aequitas touted that its investors "have enjoyed consistent quarterly interest payments with no loss of principal since 2003." And they

were told that their securities were liquid, meaning that investors could cash out of their investments if they chose to do so. Each of those representations was false.

3.    In truth, there was nothing stable or secure about the investments. Aequitas was dependent upon investor money—not to fund purchases of assets, as Aequitas represented—but to satisfy redemptions and interest payments to other investors—the hallmarks of a Ponzi scheme. Aequitas was also dependent upon investors renewing their investments on maturity, to avoid huge redemption obligations. Aequitas' assets did not generate sufficient income to satisfy Aequitas' massive debt obligations, including to the investors. Investors were not told this. Instead, Aequitas manufactured an appearance of financial strength by manipulating the value of assets carried on its books. Aequitas accomplished this for years by constructing a morass of interrelated companies and frequent inter-company transactions. The collateral values reflected on its books and in financial statements provided to investors were highly inflated. Aequitas failed to write down the collateral values even when the assets were severely distressed or worthless. For instance, the "financially strong" education institution that originated the student loans in which Aequitas invested was the unstable, notorious for-profit Corinthian Colleges. Aequitas failed to disclose that a significant portion of investors' money was used to fund various Aequitas-related or -sponsored companies, without receiving fair value. Nor did Aequitas disclose the substantial commissions it paid to Aequitas employees. Aequitas spent money lavishly, and Aequitas' business operations did not generate sufficient income to pay its obligations. Aequitas manufactured an appearance of financial strength by manipulating the value of assets carried on its books, frequently through inter-company transactions. Aequitas was dependent upon investor money—not to fund purchases of assets, as Aequitas represented, but to satisfy redemptions and interest payments to other investors.

Page    8 – SECOND CORRECTED SECOND AMENDED COMPLAINT

4.       Aequitas internal documents reveal that Aequitas was dependent on receipt of new investor money at least as early as 2010. Aequitas internal communications detail a continuous cash crunch and dependence on raising huge amounts of new investor money and upon dissuading existing investors from redeeming their securities for survival. Rather than acknowledge its extensive problems, Aequitas implemented a facade. To the outside world, Aequitas was flying high, throwing lavish parties, opening expensive new offices, hiring new employees, traveling by private plane—all of which compounded Aequitas' financial problems—and reporting impressive financial results. Inside the company, executives discussed in dire terms the company's continual failure to sell sufficient new securities to purchase assets and meet obligations. For example, an October 2015 memo from one executive documents extensive, ongoing misuse of investor funds, misrepresentations in the sale of securities, failure to provide adequate disclosure information to investors, and routine violations of SEC rules and regulations. In February 2016, Aequitas was forced to admit that it could not satisfy investors' redemption requests or make interest payments, leading to its implosion, the termination of nearly all of its employees, a lawsuit by the Securities and Exchange Commission, and a request to have a receiver appointed to manage the disaster.

5.       It appears that the liquidation of the investments Aequitas made with investors' money from the receivership will result with a shortfall of hundreds of millions of dollars in losses. However, Aequitas was able to operate this scheme for years with the help of the named defendants (*e.g.,* Tonkon Torp, Sidley Austin and Integrity) who prepared misleading marketing materials used by Aequitas. Aequitas also was able to operate this scheme for years by touting financial results reported in audited financial statements prepared by defendant Deloitte & Touche.

Page    9 – SECOND CORRECTED SECOND AMENDED COMPLAINT

6.      The focus of this lawsuit is on AIOF-II, a product formed in 2014 that purported to be an investment vehicle, but was specifically and fraudulently created to make up for shortfalls in Aequitas's earlier products, rather than provide investors with an investment return. In short, since the AIOF-II investors were the last to invest, they were the biggest victims of the fraud that was Aequitas.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action because: (a) many the plaintiffs in this action reside within this state and district, (b) defendants engaged in business and substantial activities in this state and this district; and (c) the injuries to plaintiffs arose from acts and omissions that occurred within the state of Oregon and within this district.

8.      This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. Pro. 4(k)(1)(a) because Defendants are subject to the jurisdiction of the courts of general jurisdiction in Oregon. Defendant Tonkon Torp LLP is a citizen of Oregon. The activities of Defendants Deloitte & Touche LLP and Sidley Austin LLP in Oregon and the services they provided to persons in Oregon form the basis of the claims asserted against them in this complaint. The services that Integrity Bank & Trust provided to persons in Oregon form the basis of the claims asserted against them in this complaint. Each of the Defendants engaged in conduct made actionable under the Oregon Securities Law.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in Oregon and in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

10.     Defendants' actions further confirm jurisdiction and venue are proper in this district as they removed this action, originally filed in state court, to this court.

## PARTIES

**Jackson Wealth Management Group Plaintiffs**

11.    Plaintiffs Harry and Unna Albers, residents of California, as trustees for the Harry and Unna Albers Family Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about March 2015.

12.    Plaintiff Karen Anderson, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $140,000, in or about September 2015.

13.    Plaintiff Jean Andreiko, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about September 2015.

14.    Plaintiff Jody Andreiko-Odegard, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $105,000, in or about September 2015.

15.    Plaintiff Scott Andreiko, a resident of California, as trustee for the Scott Andreiko I 401(k) Plan PSP, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about October 2015.

16.    Plaintiffs Francis and Betty Flaim, residents of California, acting in their capacity and as trustees of the Flaim Revocable Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of 130,000, in or about March 2015.

17.    Plaintiff Joann Flaim, a resident of California, acting in her capacity and as trustee of The Bradley Daughter 2006 Revocable Living Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $400,000, in or about September 2015.

18.    Plaintiff Stephen Flaim, a resident of California, acting in his capacity and as trustee of the Flaim 1998 Family Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $295,000, in or about April 2015.

19.    Plaintiff Stephen Flaim, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $180,000, in or about April 2015.

20.     Plaintiff Stephen Flaim, a resident of California, acting in his capacity and as trustee of the John G Watson Foundation Inc., LLC, purchased an interest in AIOF-II from Aequitas in the total principal amount of $55,000, in or about April 2015.

21.     Plaintiffs Larry Goldstein and Nancy Wiedlin, residents of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $240,000, in or about April 2015.

22.     Plaintiff Paul Heath, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about March 2015.

23.     Plaintiffs Thomas and Sarajean Herrmann, residents of Wisconsin, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about April 2015.

24.     Plaintiff Colleen Hoblit, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about March 2015.

25.     Plaintiff David Jackson, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $201,000, in or about May 2015.

26.     Plaintiffs Greg Lewis and Mary Jackson, residents of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $120,000, in or about March 2015.

27.     Plaintiff Robert Manly, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about March 2015.

28.     Plaintiff Anne McCammon, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about April 2015.

29.     Plaintiff Donald McGee, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $125,000, in or about March 2015.

30.     Plaintiff William Olhausen, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $156,000, in or about April 2015.

31.     Plaintiffs William and Dona Olhausen, residents of California, acting in their capacities and as trustees of the Olhausen Family Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $1,500,000, in or about May 2015.

32.     Plaintiff Carol Paquette, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about March 2015.

33.     Plaintiff Gabriela Parente, a resident of California, acting in her capacity and as trustee of the M. Gabriela Parente Family Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $110,000, in or about March 2015.

34.     Plaintiff Beatrice Rector, a resident of Oregon, acting in her capacity and as trustee of the Beatrice Rector Revocable Living Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about March 2015.

35.     Plaintiff Rick Rehan, a resident of California, acting in his capacity and as trustee of The Rehan Family 1990 Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about May 2015.

36.     Plaintiff Michael Stevenson, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about March 2015.

37.     Plaintiffs Anne and George Stoll, residents of California, as trustees of The Stoll Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $150,000, in or about April 2015 to May 2015.

38.     Plaintiff William Tyson, a resident of New Hampshire, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about October 2015.

39.    Plaintiff Greg Vanduzer, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about May 2015.

**Elite Wealth Management Plaintiffs**

40.    Plaintiff Rahel Abraham, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $393,000, in or about May 2015.

41.    Plaintiff Virginia Adams, a resident of Alaska, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about October 2014.

42.    Plaintiff Richard Ader, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $268,000, between February and December 2015.

43.    Plaintiffs Paul and Ernestine Allen, residents of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $636,100, in or about October 2014.

44.    Plaintiffs Peter Anderson and Susan Roeseler, residents of Washington, jointly purchased an interest in AIOF-II from Aequitas in the total principal amount of $354,100, between February and December 2015. Susan Roeseler also individually purchased an additional interest in AIOF-II in the principal amount of $373,400 from Aequitas between June and July 2015.

45.    Plaintiffs Leigh Anne Hadley and Karl Balzer, residents of Oregon, jointly purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about July 2015. Plaintiff Leigh Anne Hadley also separately purchased $50,000 in July 2015. Karl Balzer also separately purchased $175,000 in December 2015.

46.    Plaintiff James Barber, resident of Washington, as trustee of the James and Emma Barber Marital Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about October 2014.

47.    Plaintiff Steven Beaird, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $199,600, in or about December 2015.

48.    Plaintiffs Gregory and Barbara Bergere, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $200,000, in or about October 2015.

49.    Plaintiffs Muraldharan Bhoopathy and Amudha Sundaramurthy, residents of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $134,400, in or about December 2015.

50.    Plaintiff Rosanna Boulton, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of 535,700, in or about July 2015.

51.    Plaintiff Phil Boulton, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $183,000, in or about July 2015.

52.    Plaintiff Steve Boyd, a resident of California, acting for himself and in his capacity as trustee of the Sabella Boyd Family Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about December 2015.

53.    Plaintiff Laura Brackenridge, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $350,000, in or about October 2015.

54.    Plaintiff John Brill, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $339,500, in or about July 2015.

55.    Plaintiff Alvan Brown, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $200,000, in or about October 2015.

56.    Plaintiff Edward Bulger, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $1,550,400, in or about April 2015.

57.    Plaintiff Edward Bulger, a resident of Washington, acting in his capacity as trustee of the Bulger Living Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $344,500, in or about April 2015.

58.    Plaintiffs Dan and Susan Bureau, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about June 2016.

59.    Plaintiff Joel Bushman, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $125,000, in or about July 2015.

60.    Plaintiff Kim Caldwell, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about June 2015.

61.    Plaintiff Angela Cheek, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $222,200, in or about January 2015.

62.    Plaintiff David Cheek, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $237,800, in or about October 2015.

63.    Plaintiff Kevin Chen, a resident of Washington, acting for himself and in his capacity as trustee of Joy Capital, LLC, purchased an interest in AIOF-II from Aequitas in the total principal amount of $4,037,000, in or about May 2015.

64.    Plaintiff Kevin Chen, a resident of Washington, acting in his capacity as trustee of Lian Shao, purchased an interest in AIOF-II from Aequitas in the total principal amount of $1,082,600, in or about September 2014.

65.    Plaintiff Chu-Tien Chia, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $805,600, in or about June 2015.

66.    Plaintiffs Sheung Chow and Wing-Hung Yan, residents of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about December 2015.

67.     Plaintiffs Jeffrey and Ronni Cohen, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $794,700, in or about August 2014.

68.     Plaintiff Karra Crawford, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $386,200, in or about April 2015.

69.     Plaintiff Timothy Custer, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $284,200, in or about October 2014.

70.     Plaintiff Alexander Memoran Dadgar, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $294,500, in or about between August 2014 and January 2016. Alexander Memoran Dadgar also was assigned an additional $284,500 of interest in AIOF-II which he received from Armon Dadgar. Armon Dadgar purchased this now-assigned interest from Aequitas in or about between September 2014 and January 2016.

71.     Plaintiffs Ali Dadgar and Fariba Ronnasi, residents of Washington, jointly purchased an interest in AIOF-II from Aequitas in the total principal amount of $850,300, in or about between May 2015 and November 2015. In addition, Plaintiff Ali Dadgar individually purchased an interest in AIOF-II from Aequitas in the total principal amount of $40,000, in or about between December 2015 and January 2016.

72.     Plaintiffs Ernest and Paige Dantini, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about March 2015.

73.     Plaintiff Tuan Dao, a resident of Texas, as owner of Bay36 Partners LLC, purchased an interest in AIOF-II from Aequitas in the total principal amount of $80,000, in or about September 2015.

74.    Plaintiff Judy Delarose, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about April 2015.

75.    Plaintiffs Kam and Parisa Derakshani, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $500,000, in or about October 2015.

76.    Plaintiff Gurcharan K. Dhaliwal, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about July 2015.

77.    Plaintiff Barbara Downs, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $330,500, in or about July 2015.

78.    Plaintiff David Eide, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $367,000, in or about May 2015.

79.    Plaintiff Peggy Eide, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $453,000, in or about May 2015.

80.    Plaintiffs Gary and Kathleen Etchells, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $500,000, in or about August 2015.

81.    Plaintiff Kathleen Etchells, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $380,900, in or about September 2015.

82.    Plaintiff Rudolph Faller, a resident of Washington, acting in his capacity and as trustee of Rudolph A. Faller Living Trust UA 7/13/1993, purchased an interest in AIOF-II from Aequitas in the total principal amount of $1,200,000, in or about March 2014.

83.    Plaintiff Cyrena Faller Trust, a resident of Washington, through its former trustee Cyrena Faller, purchased an interest in AIOF-II from Aequitas in the total principal amount of

$510,400, in or about March 2015.  Cyrena Faller passed away on April 12, 2015, and was succeeded as trustee by Rudolph Faller, who is still trustee of the Cyrena Faller Trust,

84.    Plaintiff Vincent B. Fernandes, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $402,200 in or about June 2015.

85.    Plaintiff Judy Flexer, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $666,800 in or about May 2015.

86.    Plaintiff Ken Flexer, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $507,000 in or about October 2014.

87.    Plaintiff David Fontana, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $266,800 in or about October 2015.

88.    Plaintiff Ryan Fox, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $64,400 in or about December 2015.

89.    Plaintiff Linda Gilson, a resident of Alaska, purchased an interest in AIOF-II from Aequitas in the total principal amount of $325,200 in or about June 2015.

90.    Plaintiff John Gonnella, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $110,000, in or about June 2015.

91.    Plaintiff Carol Gonnella, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $130,000, in or about June 2015.

92.    Plaintiff John Gould, Jr., resident of Washington, as executor of the estate of John V. Gould, purchased an interest in AIOF-II from Aequitas in the total principal amount of $150,000, and individually purchased $559,600 between May 2015 and December 2015.

93.    Plaintiff Sally Gould, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $335,700, in or about December 2015.

94.     Plaintiff Terrance Grier, a resident of Washington, acting in his capacity as trustee of Terrance M and Diane M Grier Trust 12/27/2010, purchased an interest in AIOF-II from Aequitas in the total principal amount of $300,000, in or about between May and December 2015.

95.     Plaintiff Edith Grobe Foundation, a charitable foundation based in Washington, through its' trustees, David Whitney and Ruth Whitney, purchased an interest in AIOFII in the total principal amount of $560,900 or about between December 2014 and August 2015.

96.     Plaintiff Bruce Hale, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $200,000, in or about October 2015.

97.     Plaintiff John Haller, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $150,000, in or about August 2014.

98.     Plaintiff John Haller, a resident of Washington, acting in his capacity as trustee of the Franklin M. Henry Marital Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $86,600, in or about January 2016.

99.     Plaintiff David Harris, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $132,200, in or about May 2015.

100.     Plaintiff James Harvey, a resident of Oregon, acting in his capacity as trustee of Harvey Revocable Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $464,500, in or about May 2014.

101.     Plaintiff Donald Hauge, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $628,400, in or about August 2015.

102.     Plaintiff Max Anton Herde, a resident of Thailand, purchased an interest in AIOF-II from Aequitas in the total principal amount of $507,000, in or about between April and December 2015.

103.    Plaintiff Charles Edward Huggins III, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $485,100, in or about June 2014.

104.    Plaintiff Rollie Hunt, a resident of Washington, acting in his capacity as trustee of Strand Hunt Construction, purchased an interest in AIOF-II from Aequitas in the total principal amount of $110,600, in or about December 2014.

105.    Plaintiff Dolores Johansen, a resident of Oregon, acting in her capacity as trustee of Johansen Family Survivors Trust U/A DTD 2/01/1993 and Johansen Credit Shelter Trust U/A DTD 2/01/1993, purchased an interest in AIOF-II from Aequitas in the total principal amount of $317,000, in or about November 2014.  Dolores Johansen passed away on February 19, 2018, and was succeeded as trustee of Johansen Family Survivors Trust U/A 2/01/1993 and Johansen Credit Shelter Trust U/A DTD 2/01/1993 by Plaintiff Daniel Johansen.

106.    Plaintiff Arash Kabir and Sana Parsian, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $639,200, in or about May 2015.

107.    Plaintiff Armin Kabir, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $399,700, in or about May 2015.

108.    Plaintiffs Armin Kabir and Mina Loghavi, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $65,400, in or about July 2015.

109.    Plaintiffs Victoria and Gregory Karpstein, residents of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $240,800, in or about November 2015.

110.    Plaintiff Kelly Kim, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about September 2014.

111.    Plaintiffs Ross and Lorrelle Klinger, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $599,600, in or about between December 2014 and July 2015.

112.    Plaintiff Robert Klink, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $70,000, in or about December 2015.

113.    Plaintiff Patricia Klink, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $220,600, in or about May 2015.

114.    Plaintiffs Robert and Renee Koch, residents of Tennessee, acting for themselves and in their capacities as co-trustees of The Renee C. Koch Living Trust and The Robert H. Koch Living Trust, purchased an interest in AIOF-II in the total principal amount of $119,900, in or about between June 2015. Robert Koch individually purchased an additional $197,600 interest in AIOF-II from Aequitas in December 2015.

115.    Plaintiff Kevin Korpi, resident of Washington, purchased an interest in AIOF-II in the total principal amount of $75,800, in or about August 2015.

116.    Plaintiff Wen LaCasse, a resident of Washington, purchased an interest in AIOF-II in the total principal amount of $506,100, in or about April 2015.

117.    Plaintiffs Clifford and Myrna Laycock, residents of Washington, acting in their capacities as co-trustees of Clifford and Myrna Laycock Family Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $694,300, in or about between February and December 2015.

118.    Plaintiff Ann Elizabeth LeClair, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $93,900, in or about June 2015.

119.    Plaintiff Mark LeClair, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $48,800, in or about November 2015.

120.    Plaintiff Irving Levinson, a resident of Texas, purchased an interest in AIOF-II from Aequitas in the total principal amount of $350,000, in or about April 2015.

121.    Plaintiff Robert Levinson, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $250,000, in or about October 2015.

122.    Plaintiff Mechele Limbaugh, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about September 2014.

123.    Plaintiff Tony Limbaugh, Jr., a resident of Washington, as power of attorney for his deceased parents, Tony Limbaugh Sr. and Lola Limbaugh, purchased an interest in AIOF-II from Aequitas in the total principal amount of $225,000, in or about between May and September 2015.

124.    Plaintiff James Livermore, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $328,700, between August 2015 and October 2015.

125.    Plaintiff Brad Lundberg, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $321,000, in or about May 2015.

126.    Plaintiff Deborah Maloney, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $350,000, in or about October 2015.

127.    Plaintiffs Sean and Joni Mayer, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $262,800, between January and November 2015.

128.    Plaintiff Karin McGinn, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $218,900, in or about June 2015.

129.    Plaintiffs John McGinn, resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $108,700, in or about November 2015.

130.    Plaintiff John McKenna, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $127,500, in or about October 2014.

131.    Plaintiff Catherine Moeller, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $556,700, in or about June 2015.

132.    Plaintiff Edward Moore, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about February 2015.

133.    Plaintiffs Mehrdad Naeini and Shahrzad Amini, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $195,000, in or about April 2015.

134.    Plaintiffs Joseph and Kela Ness, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $370,900, in or about February 2014.

135.    Plaintiff Mary Nicholson, a resident of Arizona, purchased an interest in AIOF-II from Aequitas in the total principal amount of $300,000, in or about June 2015 (account created in May 2015).

136.    Plaintiff Donald Norton, a resident of Texas, purchased an interest in AIOF-II from Aequitas in the total principal amount of $591,800, in or about between August and November 2015.

137.    Plaintiff Heidi Owens, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $285,600, in or about between March 2014 and November 2015.

138.    Plaintiff Mary T. Peterson, a resident of Washington, in her capacity as trustee of the Mary T. Peterson Revocable Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $300,000, in or about April 2015.

139.    Plaintiffs Sudha Pidikiti and Vikram Yemulapalli, residents of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $162,400, in or about August 2014.

140.    Plaintiff Emily Quan, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about November 2015.

141.    Plaintiff Donald Ramsthel, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $357,700, in or about August 2015.

142.    Plaintiff Laleh Ramsthel, as trustee for The Laleh Ramsthel Revocable Trust, a resident of California, purchased an interest in AIOF-II from Aequitas in twhe total principal amount of $326,600, in or about August 2015. Additionally, Laleh Ramsthel through an IRA account purchased an interest in AIOF-II from Aequitas in the total principal amount of $290,600 in or about September 2015.  Laleh Ramsthel passed away on October 12, 2017, and Ms. Ramsthel's AIOF-II interest in her IRA was distributed to her designated beneficiaries, Plaintiffs Sheila Heimbach, Mitchell Heimbach and Paige Heimbach.  Plaintiff Sheila Heimbach also succeeded Laleh Ramsthel as trustee for The Laleh Ramsthel Revocable Trust and is still currently trustee for The Laleh Ramsthel Revocable Trust.

143.    Plaintiff Anthony Ravani, a resident of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $491,600, in or about December 2015.

144.    Plaintiff Edna Read, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $446,200, in or about between February and December 2015.

145.    Plaintiff Patricia Rebne, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $395,000, in or about August and November 2015.

146.    Plaintiff John Redl, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $231,800, in or about between April and December 2015.

147.    Plaintiff Owen Reese Jr, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $614,700, in or about between October 2014 and November 2015.

148.    Plaintiff Dan Reiner, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $301,800, in or about July 2014.

149.    Plaintiff Jeri Morgan Reiner, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $200,000, in or about June 2015.

150.    Plaintiffs Allen and Susan Reiter, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $152,200, in or about November 2013.

151.    Plaintiff Susan Reiter, a resident of Washington, acting in her capacity as trustee of Joseph E Feldman Trust FBO UA 6/15/1984, purchased an interest in AIOF-II from Aequitas in the total principal amount of $150,000, in or about November 2013.

152.    Plaintiff Allen Rhyasen, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $354,000, in or about between May and December 2015.

153.    Plaintiff Raymond Ringering, a resident of Idaho, purchased an interest in AIOF-II from Aequitas in the total principal amount of $150,000, in or about January 2015.

154.    Plaintiff Fariba Ronnasi, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $280,000, in or about November 2015.

155.    Plaintiff Susan Sabella, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $167,600, in or about April 2015.

156.    Plaintiff Ken Schreier, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $696,900, in or about between July and December 2015.

157.    Plaintiff Behrouz Shokri, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $607,000, in or about January 2016.

158.    Plaintiffs Behrouz and Fariba Shokri, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $80,500, in or about January 2015.

159.    Plaintiff Gary Simpson, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $290,000, in or about May 2015.

160.    Plaintiffs David and Polly Skone, residents of California, purchased an interest in AIOF-II from Aequitas in the total principal amount of $750,000, in or about July 2015.

161.    Plaintiffs Lakshmi Srinivasan and K.S. Venkatraman, residents of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $212,200, in or about September 2014.

162.    Plaintiff Christopher Stahl, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $355,400, in or about between June 2015 and January 2016.

163.    Plaintiff Tim Starkey, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $75,000, in or about May 2015.

164.    Plaintiffs James and Devon Surgent, residents of Washington, jointly purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about November 2015.

165.    Plaintiff Devon Surgent individually purchased an additional interest in AIOF-II from Aequitas in the total principal amount of $262,000 in or about June 2015.

166.    Plaintiffs Marla and George Surgent, residents of Maryland, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about October 2015.

167.    Plaintiff Laurie Sylla, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $195,000, in or about October 2015.

168.    Plaintiff Sita Vashee, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $290,000, in or about October 2015.

169.    Plaintiff Vijaykumar Vashee, a resident of Washington, individually and as trustee of the Vashee Family Limited Partnership, purchased an interest in AIOF-II from Aequitas in the total principal amount of $1,283,000, in or about October 2015.

170.    Plaintiff Donald Verkest, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $276,600, in or about October 2015.

171.    Plaintiff Linda Wall, a resident of Iowa, purchased an interest in AIOF-II from Aequitas in the total principal amount of $303,000, in or about September 2013.

172.    Plaintiff David Whitney, a resident of Washington, individually and as trustee for the David and Ruth Whitney Family Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $311,000, in or about between September 2014 and June 2015.

173.    Plaintiff Philip Widmer, a resident of Oregon, purchased an interest in AIOF-II from Aequitas in the total principal amount of $163,000, in or about June 2015.

174.    Plaintiff Maureen Wimbiscus, a resident of Illinois, acting in her capacity as trustee of Maureen A. Wimbiscus Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about January 2016.

175.    Plaintiff Kyle Yakabu, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $150,000, in or about December 2015.

176.    Plaintiffs Farokh and Geeti Yazdani, residents of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $274,900, in or about April 2014.

177.    Plaintiff Mary T. Peterson, a resident of Washington, in her capacity as trustee of the Mary T. Peterson Revocable Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $300,000, in or about April 2015.

**Concert Wealth Management Plaintiffs**

178.    Plaintiff Galena Investments, Inc., a company based in Barbados, through its Director, Christopher J.N. Towner, purchased an interest in AIOF-II from Aequitas in the total principal amount of $1,569,800 in or about between March and November 2015.

179.    Plaintiff Leslie Ferrone, a resident of Washington, purchased an interest in AIOF-II from Aequitas in the total principal amount of $100,000, in or about December 2015.

180.    Plaintiffs Richard and Jennifer Monahan, residents of Georgia, acting in their capacities as trustees for the Monahan Living Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about January 2016.

181.    Plaintiff Donald Searcy, a resident of Illinois, acting in his capacity as trustee of Elizabeth Anne Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $50,000, in or about April 2015.

182.    Plaintiff Kathleen Searcy, a resident of Illinois, acting in her capacity as trustee of the Kathleen M. Searcy Trust, purchased an interest in AIOF-II from Aequitas in the total principal amount of $1,000,000, in or about April 2015.

**Defendants**

183.    Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership registered to do business in Oregon. Deloitte performed auditing and accounting services for Aequitas and enabled Aequitas to sell securities, including the securities at issue in this action. Deloitte began working with Aequitas on or about September 12, 2013 when it replaced EisnerAmper LLP as Aequitas' auditor. Deloitte prepared audited financial statements for Aequitas for 2013 and 2014. These audited financial statements were excerpted and referenced in offering documents and provided to prospective investors and existing investors deciding whether to invest or re-invest. The audited financial statements were a material part of the information made available to investors and the existence of an auditor gave Aequitas and its securities the appearance of legitimacy. Indeed, the offering documents for Aequitas Securities prominently identified Deloitte as Aequitas' auditor. On and after March 24, 2014, Deloitte was identified, in the publicly-available Form ADV filed by Aequitas Investment Management, LLC ("AIM") as the auditor for *all* Aequitas funds (*i.e.,* all Aequitas fundraising vehicles other than ACF). This includes AIOF-II, the investment at issue in this action.

184.    Defendant Sidley Austin LLP ("Sidley") is an Illinois limited liability partnership. Sidley is an international business law firm that provided legal services to Aequitas in connection with the sale of securities, including those at issue in this action. In particular, at least as early as 2014, Sidley provided legal services to Aequitas Investment Management, LLC ("AIM"), the manager of and investment advisor to AIOF-II, which oversaw the operations and investment decisions of AIOF-II in exchange for certain management fees and other interests. On information and belief, Sidley advised Aequitas with respect to the sale of its securities (including AIOF-II), and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, and subscription agreements for AIOF-II. Sidley also advised Aequitas with respect to the sale of its securities, including

providing a critical legal opinion regarding Aequitas' compliance with the Investment Advisers Act of 1940 that enabled Aequitas to obtain clean audit opinions from EisnerAmper and Deloitte and to sell securities, and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, and subscription agreements. Sidley prepared these documents with knowledge that Aequitas would sell the subject securities. Sidley was also identified as legal counsel to Aequitas in offering documents. Aequitas securities, including AIOF-II, could not have been sold without the legal services that Sidley provided.

185.    Defendant Tonkon Torp LLP ("Tonkon") is an Oregon limited liability partnership. Tonkon is a law firm with offices in Portland. At all material times, Tonkon provided legal services to Aequitas in connection with the sale of securities, including AIOF-II. Tonkon advised Aequitas with respect to the sale of its securities and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, subscription agreements and promissory notes. Tonkon prepared these documents with knowledge that Aequitas would sell the subject securities. Tonkon was identified as legal counsel to Aequitas in numerous offering documents. Aequitas securities, including AIOF-II, could not have been sold without the legal services that Tonkon provided.

186.    Defendant Integrity Bank & Trust ("Integrity") is a Colorado commercial bank. Integrity served as the custodian for certain Aequitas fundraising entities. Importantly, Integrity actively offered and solicited the sale of AIOF-II on Aequitas' behalf and was a crucial and integral part of the AIOF-II offerings by which Plaintiffs invested in AIOF-II.

187.    Defendants Tonkon, Sidley and Deloitte prepared documentation used in connection with the sales of Aequitas securities including AIOF-II. Defendants Tonkon, Sidley, Deloitte and Integrity lent the use of their names to Aequitas's promotional materials. All defendants helped Aequitas raise investor funds that gave Aequitas the illusion of credibility.

The funds defendants helped raise created the illusion that Aequitas was highly experienced, highly expert, able to locate and invest in special opportunities, able to minimize risk, and able to earn above market returns; that Aequitas had a track record of being able to keep and perform its obligations; that investments in Aequitas were safe and secure; that a purchaser was taking upon him or herself nothing more than the ordinary risks incident to a business making a series of well-secured loans to a diversified portfolio of borrowers; and that Aequitas was solvent. The funds defendants helped raise covered up the fact that Aequitas was selling securities, including AIOF-II, to investors by means of untrue statements and misleading omissions. Defendants covered up Aequitas's mounting losses and undisclosed risks, including significant credit and default risks associated with under-secured intercompany loans and with the student loan portfolios that Aequitas had purchased with investor funds. They covered up that the sum of Aequitas's debts was greater than its assets, that it was insolvent, and that but for new investor money, it would not be able to pay its debts as they became due. These untrue statements and misleading omissions form a critical part of the means by which the Aequitas securities were sold, without which Aequitas would have collapsed before plaintiffs put their money at risk. Without defendants, Aequitas could not have created and maintained false expectations and the illusion of prosperity.

## FACTUAL ALLEGATIONS

### I.   THE AEQUITAS ENTITIES

188.   Founded in 1993, Aequitas operated out of its central Lake Oswego, Oregon, offices under the leadership of its chief executive officer and president, Robert Jesenik.

189.   Aequitas sold investors on an investment strategy that consisted primarily of subprime investments in "underrepresented" credit markets, including healthcare, student loans, and consumer credit. At one point, Aequitas focused on buying healthcare receivables from

hospitals around the country. Aequitas emphasized the purported safety of its investments based, in part, on recourse agreements that required the hospitals to buy back delinquent receivables.

190.    Beginning in or around 2011, Aequitas expanded its healthcare receivables strategy to student loan receivables, investing heavily in student loan receivables from Corinthian, a for-profit education company. Over the years that followed, Aequitas acquired a substantial position in Corinthian student loan receivables. Many of these loans were subject to recourse agreements with Corinthian.

191.    Aequitas touted that it operated its "business prudently," assuring investors that "[w]hen in doubt," Aequitas would "share more—not less with clients." In addition to applying "faith-based values throughout" its organization, Aequitas "use[d] innovation and imagination to conceive and achieve things that did not exist before."

192.    To the contrary, Aequitas misled investors and used investors' money for its executives' personal gain and vanity, including private jets, extravagant parties and trips, and new offices.

193.    Through the design and engineering of Jesenik, other Aequitas employees, and outside legal counsel, including Tonkon and Sidley, the Aequitas operation expanded into a web of over 75 interrelated companies, many of which shared overlapping management and ownership. This complex organizational structure aided Aequitas in hiding the true nature of Aequitas' business. The integrated nature of the Aequitas businesses was a material part of the information communicated by Aequitas to investors. Investors were told that "Aequitas conducts its business activities and transactions through various affiliate companies and trade names." Investors were told that the returns on their investments in a particular Aequitas fund or company would be tied to the performance of other Aequitas entities, and that assets of affiliate companies secured their investments. Investors were told that money was shared between Aequitas

companies for their benefit, regardless of the specific company or fund they invested in, and that interest and principal on their investments would be repaid, in part, via repayment of loans from affiliated Aequitas companies.

194.    Formed in 2007, Aequitas Management, LLC ("Aequitas Management") is the parent entity of the affiliated Aequitas entities. Aequitas Management presently owns 84 percent of Aequitas Holdings, LLC ("Holdings"), which presently is the sole owner and member of Aequitas Commercial Finance, LLC, and the sole shareholder of Aequitas Capital Management, Inc.

195.    Aequitas Commercial Finance, LLC ("ACF"), a wholly owned subsidiary of Holdings, owns all or part of AIOF-II and numerous other Aequitas entities, including Aequitas Income Protection Fund, LLC ("AIPF"), Aequitas Income Opportunity Fund, LLC ("AIOF"), Aequitas Capital Opportunities Fund, LP ("ACOF"), Aequitas ETC Founders Fund, LLC ("AETC"), Aequitas Enhanced Income Fund, LLC ("AEIF"), and MotoLease Financial, LLC ("AMLF"). ACF was listed as AIOF-II's sole member in AIOF-II's private placement memorandum ("PPM") and was described as having purchased and having complete voting control over AIOF-II's equity interests.

196.    Aequitas Capital Management, Inc. ("ACM"), another wholly owned subsidiary of Holdings, is the manager of numerous Aequitas entities, including ACF and AMLF. As such, ACM oversees the operations and investment decisions of ACF and AMLF in exchange for certain management fees and other interests. ACM oversaw the operations and investment decisions of AIPF, AIOF, AIOF-II, AETC, AEIF, APCF, and ACOF in exchange for certain management fees and other interests.

197.    Aequitas Investment Management, LLC ("AIM"), a wholly owned subsidiary of ACM and an SEC-registered investment adviser, is the manager of AIOF-II, AIPF, AIOF,

AETC, AEIF, Aequitas Private Client Fund, LLC ("APCF"), and Aequitas Capital Opportunities GP, LLC, the general partner of ACOF ("ACOFGP"). As such, ACM oversees, and at all material times oversaw, the operations and investment decisions of AIOF-II, AIPF, AIOF, AETC, AEIF, APCF, and ACOF (collectively, the "Aequitas Funds") in exchange for certain management fees and other interests. The sole purpose of AIM was to act as the manager and/or investment advisor to various Aequitas fundraising vehicles, including AIOF-II. The AIOF-II PPM listed AIM as both the manager of and the investment advisor to AIOF-II. AIM is wholly owned by ACM.

198.    The offerings of the Aequitas securities were a single integrated offering for purposes of the securities registration requirements under state and federal law. ACF owned all of the equity interests in AIOF, AIOF-II, AEIF, and AMLF, and all of the voting interests in AIPF, and ACF expressly guaranteed all of the notes sold by AMLF. Aequitas created ACOF for the purpose of swapping investor funds for ownership interests in certain Aequitas entities— Aequitas caused ACF and Holdings to contribute those ownership interests to ACOF at inflated values, and Aequitas then caused investor funds to be distributed out of ACOF to ACF and Holdings based on those inflated contributions. Many of the ACOF portfolio companies were entirely dependent on ongoing ACF financing, and many of the ACOF portfolio companies were dependent on ACF (through its subsidiaries) as their sole source of revenue. Aequitas created both AEIF and AIOF-II for the sole purpose of funneling investor funds to ACF and its affiliates, and that ultimately was the function of AIOF and AIPF as well—as of December 31, 2014, their only assets were approximately $33 million and $37 million, respectively, in loans to ACF and certain of its affiliates. The integrated nature of these offerings was reflected in the audited financial statements of ACF, which were done on a consolidated basis and encompassed ACF, AIPF, AIOF, AIOF-II, AEIF, ACOF, and AMLF, as well as numerous other Aequitas entities.

II.     THE AEQUITAS SECURITIES

199.     Aequitas raised hundreds of millions of dollars from thousands of investors by

selling securities issued by ACF, the Aequitas Funds, and AMLF (collectively, the "Aequitas

Securities"). None of the Aequitas Securities were registered under any state or federal securities

law. As described herein, these securities were not exempt from registration, and were not

federal covered securities. This includes AIOF-II.

200.     Aequitas raised investor funds by causing ACF to sell securities (the "ACF

Notes") directly to investors through the so-called Aequitas "Private Note" program. The ACF

Notes were generally referred to as "Secured Subordinated Promissory Notes" or "Secured

Notes." The Private Note program was a continuous, unlimited offering. The offering had no

ending date and no limit on the total investments. The sale of the ACF Note securities was the

primary means by which Aequitas raised investor funds. As of December 31, 2015,

approximately $312 million in ACF Notes were outstanding to more than 1,500 investors. The

ACF Notes paid interest rates ranging from 5 to 15 percent.

201.     Aequitas raised additional investor funds by causing the sale of securities through

other Aequitas entities, including the Aequitas Funds and AMLF. Relevant to this action,

Aequitas generally referred to the securities sold through AIOF-II (the "AIOF-II Notes") as

"Senior Secured Promissory Notes."

202.     Defendants were integral to the AIOF-II and other Aequitas' securities offerings.

For example:

         (a) Deloitte acted as the auditor for AIOF-II and numerous other Aequitas

         investment vehicles, including ACF; AIPF; AIOF; ACOF; AETC; AEIF; Aequitas

         CarePayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC.

         Deloitte audited the consolidated financial statements of ACF, which encompassed

AIOF-II and ACF as well as the following Aequitas entities: CarePayment, LLC; CP Funding I, LLC; CA Medical, LLC; Campus Student Funding, LLC; Destination Capital Equipment Finance, LLC; The Hill Land Company, LLC; EC Hangar, LLC; Aequitas North American Finance, Inc.; Aequitas Equipment Finance, LLC; CP Leverage I, LLC; CSF Leverage I, LLC; Aequitas CarePayment Fund, LLC; Aequitas Income Fund, LLC; AIOF; AIPF; AEIF; ACOF; and AMLF.

(b) Tonkon provided legal services to Aequitas in connection with the sale of AIOF-II and other securities, including ACF; AIOF; AIPF; AEIF; ACOF; and AMLF, and prepared legal papers necessary for Aequitas to complete the sale of AIOF-II, including AIOF-II's PPM, as well as other Aequitas securities, including ACF; AIOF; AIPF; AEIF; ACOF; and AMLF. Tonkon provided legal services to AIM in connection with AIM's role as an SEC-registered investment adviser and the manager of AIOF-II and numerous other Aequitas investment vehicles, including ACF; AIPF; AIOF; ACOF (through its role as manager of Aequitas Capital Opportunities GP, LLC, the general partner of ACOF); AETC; AEIF; APCF; Aequitas CarePayment Founders Fund, LLC; Aequitas CarePayment Fund, LLC; Aequitas Catalyst Fund, LLC; Aequitas Commodities Fund, LLC; Aequitas Hybrid Fund, LLC; Aequitas Income Fund, LLC; Aequitas Insurance Fund I, LLC; and Aequitas WRFF I, LLC. The AIOF-II PPM specifically listed Tonkon as "Legal Counsel" for AIOF-II.

(c) Sidley provided legal services to Aequitas in connection with the sale of its securities, and prepared legal papers necessary for Aequitas to complete the sale of its securities. Sidley provided legal services to AIM in connection with AIM's role as an SEC-registered investment adviser and the manager of AIOF-II and numerous other Aequitas investment vehicles, including ACF; AIPF; AIOF; ACOF (through its role as

manager of Aequitas Capital Opportunities GP, LLC, the general partner of ACOF);

AETC; AEIF; Aequitas CarePayment Fund, LLC; Aequitas Hybrid Fund, LLC; and

Aequitas WRFF I, LLC. Sidley provided other legal services to Aequitas, including legal

opinions and other legal services that enabled Aequitas to isolate its health care

receivable assets from investors and to pledge those assets as collateral securing

Aequitas' $100 million loan facility with Wells Fargo Bank, NA, which promoted the

illusion of success and legitimacy that Aequitas required to perpetuate its ongoing efforts

to take money from investors.

(d) Integrity actively offered and solicited the sale of AIOF-II Notes and served as

the custodian of AIOF-II. In addition, Integrity served as custodian for certain other

Aequitas fundraising vehicles, including ACF; AIOF; AIPF; ACOF; AEIF; AETC;

Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC; and actively offered the ACF

Notes on Aequitas' behalf. For this action, the Elite Wealth Plaintiffs and Concert Wealth

Management Plaintiffs purchased AIOF-II notes from Integrity.

### ***The AIOF-II Notes***

203.    Aequitas formed AIOF-II in 2014 and funded it by AIOF-II Notes.

204.    Sales of the AIOF-II Notes began at least as early as November 1, 2014, and the

offering of the AIOF-II Notes continued through at least December 2015.

205.    Sales of the AIOF-II Notes (as were sales of other Aequitas Securities) were made

for the general purpose of funding the redemption of investments in other Aequitas Securities

and financing the operations of ACF, AIM, Holdings, and the other affiliated Aequitas

companies.

206.    Sales of the AIOF-II Notes occurred at or about the same time as the sales of the

ACF Notes, the AIOF Notes, the ACOF Interests, the AEIF Interests, and the AMLF Notes.

207.    Unbeknownst to AIOF-II investors, sales of the AIOF-II Notes (as were sales of other Aequitas Securities) were part of a single plan of financing. The affiliated Aequitas companies relied on this new investor funding, along with senior secured institutional credit facilities, to finance their operations and to fund investor redemptions. The affiliated Aequitas companies shifted these funds amongst themselves through various means, including inter-company loans and asset transfers.

208.    While the AIOF-II Notes were sold to plaintiffs as distinct securities, they were in fact substantially the same class of securities as the other Aequitas Securities, including but not limited to ACF Notes, that were being sold to investors.  Although the various Aequitas Securities came in different forms – promissory notes, limited liability company membership interests, and limited partnership interests – the AIOF-II Notes and other Aequitas Securities were all effectively the same class.  The AIOF-II Notes, as well as the other Aequitas Securities, all ultimately looked to, or were reliant upon, ACF for repayment, and were subordinate to the interests of Aequitas' senior secured institutional lenders.

209.    Purchasers of AIOF-II Notes and purchasers of the other Aequitas Securities received substantially the same type of consideration in connection with their purchases because, as explained above, the AIOF-II Notes and the other Aequitas Securities all ultimately looked to, or were reliant on, ACF for repayment.

210.    Despite requiring registration, the AIOF-II Notes were not registered under any state (including the Oregon Securities Law) or federal (including the Investment Company Act) securities law.

211.    The Oregon Securities Laws required the registration of the AIOF-II Notes.

212.    AIM was the manager of and investment advisor to AIOF-II and thus made all of the investment and management decisions concerning AIOF-II.

213.    ACF was the sole member of AIOF-II and purchased and had complete voting control over AIOF-II's equity interests.

214.    Aequitas Income Opportunity Fund II, LLC, the issuer of the AIOF-II Notes, and entities acting on its behalf, including Integrity, engaged in general solicitation and/or general advertising in connection with the offer and sale of the AIOF-II Notes.

a. The issuer of the AIOF-II Notes and entities acting on its behalf, including Integrity, routinely offered and sold the AIOF-II Notes to persons with whom the issuer did not have a substantial preexisting relationship.

b. The issuer of the AIOF-II Notes and entities acting on its behalf, including Integrity, engaged in roadshows promoting the AIOF-II Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIOF-II Notes did not have a substantial preexisting relationship.

c. The issuer of the AIOF-II Notes and entities acting on its behalf, including Integrity, widely disseminated promotional, marketing, offering, and sales materials relating to the AIOF-II Notes to prospective investors and/or their investment advisors, including prospective investors and investment advisors with whom the issuer of the AIOF-II Notes did not have a substantial preexisting relationship.

215.    The AIOF-II Notes were not federal covered securities under the Oregon Securities Law. Nor were the AIOF-II Notes covered securities under Section 18 of the Securities Act.

a. The AIOF-II Notes were not listed, authorized for listing, or sold on any national securities exchange, and the AIOF-II Notes were not sold in the over-the-counter market.

b. The issuer of the AIOF-II Notes did not file with the SEC any report, registration statement, or form (other than Form D).

c. The AIOF-II Notes were not exempt under Section 3(a) of the Securities Act, and offers and sales of the AIOF-II Notes were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

216.    Aequitas created AIOF-II for the sole purpose of funneling investor funds to ACF and its affiliates.

217.    The AIOF-II Notes paid 10 percent annual interest on 12-month notes. Investors could receive quarterly interest payments or reinvest interest at the same rate and receive the balance at maturity. The AIOF-II Notes were for a 12-month minimum, but no note could have a term extending beyond September 30, 2024. Most, if not all, of the AIOF-II Notes included terms that allowed the investor to extend the maturity date.

218.    The AIOF-II Notes were purportedly secured by a lien on all assets of AIOF-II. The AIOF-II Notes were characterized as "senior secured" with first-priority security interest in all assets of the fund. The AIOF-II Notes were subordinate to certain "senior lenders."

219.    AIOF-II Notes were sold pursuant to a private placement memorandum ("AIOF-II PPM"), including the AIOF-II PPM dated October 1, 2014. AIOF-II PPM identified Deloitte as its auditor and Tonkon as its legal counsel.

220.    On information and belief, Tonkon provided legal services to Aequitas, AIM, ACF and AIOF-II in connection with the AIOF-II PPM, including drafting portions of the AIOF-II PPM and performing a legal review of the contents of the AIOF-II PPM. With Tonkon's knowledge and approval, the AIOF-II PPM prominently identified Tonkon as legal counsel in connection with the offering and sale of the AIOF Notes. Investors purchased AIOF-II Notes by completing and submitting a form subscription agreement to AIOF-II. On information and belief,

Tonkon prepared or participated in the preparation or review of the form subscription agreement completed and submitted by purchasers of AIOF-II Notes as well as the documents employed to evidence the investors' investments in AIOF-II Notes. Aequitas approved the disclosures contained in the AIOF-II PPM and controlled the distribution of the AIOF-II PPM.

221.    According to AIOF-II's PPM dated October 1, 2014, AIOF-II was formed to "purchase or finance the purchases of receivables, loans, and leases from various credit strategy programs, including but not limited to, hospitals, educational institutions and other businesses." Aequitas's strategy included AIOF-II's lending money to ACF and its subsidiaries, which would then use those proceeds to "acquire portfolios of Credit Strategy Receivables."

222.    AIOF-II's PPM dated October 1, 2014, included the following statement relating to the AIOF-II investment in student loan receivables:

> All of the recourse loans that are purchased are cross-collateralized with all other loans purchased from the respective school. If a school is unable to honor its recourse obligation, Aequitas would be entitled to all of the cash flows from the loans until all of the remaining individual loans were fully repaid. By structuring the purchase of the loans at a significant discount which provides substantial overcollateralization, Aequitas is able to mitigate the risk of a school not meeting its obligation to repurchase severely delinquent loans.

223.    All, or nearly all, of the student loan receivables were from Corinthian.

224.    The AIOF-II PPM also told prospective investors that, "Aequitas evaluates the level of risk of each of the factors and structures its reliance on the collateral and institutional guaranty as appropriate."

225.    Buried on the 53rd page of the October 2014 AIOF II PPM, at page 11 of Appendix A, the PPM states that Aequitas "has entered into a loan program agreement with only one educational institutional partner, Corinthian," which "is currently under investigation by the [CFPB], the SEC and several states…. These investigations have resulted in and may result in a negative impact on Aequitas's ability to receive any recourse from Corinthian on its defaulted

student loans. …Corinthian is in default of its recourse obligations to Aequitas. This also may further impact [Aequitas] in its desire or ability to originate and market educational loan program."

226.    The October 2014 AIOF II PPM created the illusion that Aequitas had an ongoing investment program in student loan receivables that was not in crisis. It created the illusion that Corinthian's default was something other than catastrophic, and failed to disclose that Aequitas was using a Ponzi scheme to cover up catastrophe, that it was using investor funds to "replace" the funds from Corinthian. Moreover, the October 2014 AIOF II PPM misled investors by failing to disclose that Corinthian defaulted as a result of reasonably foreseeable regulatory enforcement based on Corinthian's ongoing compliance issues.

227.    At least as early as 2014, Sidley provided legal services to AIM, the manager of AIOF-II, who oversaw the operations and investment decisions of AIOF-II in exchange for certain management fees and other interests.

228.    Investors and potential investors received the audited annual financial statements of AIOF-II for the year ended December 31, 2014. Deloitte audited these financial statements. With Deloitte's knowledge and consent, from 2014 forward, the AIOF-II PPM identified Deloitte as the auditor in connection with the offering and sale of the AIOF-II Notes.

229.    In addition to the AIOF-II PPM and AIOF-II audited financials, investors and potential investors received promotional materials, quarterly updates, and other materials and information. Certain of these materials and information identified Tonkon and Deloitte and highlighted their provision of professional services to AIOF-II and Aequitas. Aequitas approved the content and controlled the distribution of such materials.

230.    Integrity successfully solicited the sale of certain AIOF-II Notes. Investors purchasing those AIOF-II Notes completed subscription agreements and custody agreements,

which were prepared by Tonkon Torp at Aequitas's direction and returned to Integrity. Integrity served and continues to serve as custodian for those AIOF-II Notes, and receives a fee for doing so.

231.    AIM managed AIOF-II. AIM received a fee for its services as manager equal to two (2) percent annually of all the assets of AIOF-II.

232.    Upon information and belief, Aequitas marketed the sale of its AIOF-II Notes through presentations and direct solicitations conducted by its executives. For example, Aequitas executives Bob Jesenik and Brian Oliver engaged in the regular solicitation and sale of Aequitas securities through numerous phone calls, presentations, meetings, golf outings, and dinners with investors during 2013, 2014, and 2015. Neither Jesenik nor Oliver was licensed as a seller or broker of such securities.

233.    As described above, each plaintiff purchased an interest in AIOF-II from Aequitas.

///

///


III.    **AEQUITAS' MATERIAL OMISSIONS AND MISREPRESENTATIONS IN CONNECTION WITH ITS SALE OF THE AEQUITAS SECURITIES**

234.    Aequitas was able to continue to attract investor funds only as a result of shifting investor funds and other assets amongst the numerous affiliated Aequitas companies in order to paint a picture of financial strength of the Aequitas companies.

### _Misrepresentations and Omissions Regarding AIOF-II_

235.    Aequitas, including AIOF-II, AIM, and ACF, made many misrepresentations and omissions regarding AIOF-II, which upon information and belief and given their relationship with Aequitas and AIOF-II, the defendants were aware of.

Page    44 – SECOND CORRECTED SECOND AMENDED COMPLAINT

236.    Aequitas, including AIOF-II, AIM, and ACF, did not disclose that the AIOF-II Notes were required to be registered under the Oregon Securities Law.

237.    Aequitas, including AIOF-II, AIM, and ACF, omitted material facts concerning the nature and extent of the commissions and other compensation paid by Aequitas that was directly linked to the sale of AIOF-II Notes.

238.    Aequitas, including AIOF-II, AIM, and ACF, did not disclose that repayment of the AIOF-II Notes was largely dependent on Aequitas' ability to bring in new investor funds.

239.    Aequitas, including AIOF-II, AIM, and ACF, did not disclose that a substantial portion of the investor funds realized from the sale of AIOF-II Notes would be used to repay other investors in Aequitas Securities.

240.    Aequitas, including AIOF-II, AIM, and ACF, omitted material facts concerning the nature and extent of the U.S. Consumer Financial Protection Bureau (the "CFPB") investigation into Aequitas' student loan program and receivables.

241.    Aequitas, including AIOF-II, AIM, and ACF, did not disclose that at least as early as mid-2015, Aequitas was the subject of an investigation by the U.S. Securities and Exchange Commission (the "SEC").

242.    Aequitas, including AIOF-II, AIM, and ACF, omitted material facts concerning the nature and extent of the SEC investigation of Aequitas.

243.    Aequitas, including AIOF-II, AIM, and ACF, did not disclose that Corinthian Colleges, Inc. ("Corinthian") was its sole source of student loan receivables.

244.    Aequitas, including AIOF-II, AIM, and ACF, did not disclose that it had pledged the Corinthian student loan receivables as collateral to secure loans to Aequitas from third party lenders.

245.    Aequitas, including AIOF-II, AIM, and ACF, did not disclose the administrative, regulatory, legal, and public perception difficulties that were undermining and diminishing the viability of Corinthian's business model and Corinthian's ability to meet its resource obligations with respect to the Corinthian student loan receivables, including, for example:

(a) Aequitas, including AIOF-II, AIM, and ACF, did not disclose Congressional hearings and an investigation by the U.S. Government Accountability Office ("GAG") into the recruitment and enrollment practices of for-profit colleges, including Corinthian;

(b) Aequitas, including AIOF-II, AIM, and ACF, did not disclose a GAO report released in 2010 concluding that for profit colleges such as Corinthian engaged in fraudulent practices designed to recruit unqualified students and overcharge the federal government for their enrollment;

(c) Aequitas, including AIOF-II, AIM, and ACF, did not disclose a review of Corinthian's practices by Corinthian's academic accrediting agency;

(d) Aequitas, including AIOF-II, AIM, and ACF, did not disclose investigations into Corinthian's practices by the U.S. Department of Education, numerous state attorneys general, and the CFPB;

(e) Aequitas, including AIOF-II, AIM, and ACF, did not disclose the announcement of new federal regulations that threatened to cut off the flow of federal aid to Corinthian students—aid on which Corinthian's existence depended;

(f) Aequitas, including AIOF-II, AIM, and ACF, did not disclose the release of a Senate investigation sharply critical of the for-profit education industry, and Corinthian in particular, including the recognition that Corinthian had a net loss of $83 million in 2011. The report from the Senate investigation further contained statements that Corinthian was on the road to financial ruin. For example, the investigation found that in 2010,

Corinthian reported 81.9% of its revenue arose from Title IV funds, but it was on the

verge of losing access to those funds:

> Beginning in 2014, any school will lose eligibility for Federal financial aid if its
> 3-year cohort default rate is greater than 40 percent in a single year, or if the
> cohort default rate is greater than 30 percent for each of the 3 most recent years.
> Corinthian's trial 3-year cohort default rates for students entering repayment in
> 2008 were over 40 percent at 13 campuses and over 30 percent at an additional 65
> campuses. Further, all 14 of Corinthian's Everest campuses in California, as well
> as two Heald and two Wyotech campuses in California, were recently removed
> from eligibility for California's student grant program because those campuses
> had a default rate of more than 24.6 percent.
>
> …
>
> While the company's high default rate is likely due in part to the high cost of
> Corinthian' programs, it also raises serious questions regarding the quality of the
> programs Corinthian provides, and whether its students who complete programs
> earn high enough wages to repay the debt they take on. Had the 3-year cohort
> default rate provision been in effect in 2011, Corinthian would have faced the loss
> of access to title IV financial aid dollars.

(internal footnotes omitted). When Corinthian ultimately lost access to Title IV financial

aid, it went out of business;

 (g) Aequitas, including AIOF-II, AIM, and ACF,  did not disclose that by June

2013, Corinthian was being investigated by the SEC related to its business practices,

including its student loan default rates, and that other governmental regulators were

investigating Corinthian as well; and

 (h) Aequitas, including AIOF-II, AIM, and ACF, did not disclose that by late

2013, it was clear that federal regulators were going to stop Corinthian's ability to obtain

federal student loan financing for its students, which would be the death-knell of the

company.

 246. Aequitas, including AIOF-II, AIM, and ACF, did not disclose that the 2014 civil

charges brought against Corinthian and Corinthian's 2015 bankruptcy (i) raised the possibility

that the entire Corinthian student loan portfolio might be rescinded, thereby wiping out any

remaining value it might have; (ii) led to widespread refusals by former students to make loan payments and greatly increased the rates of default, and (iii) eliminated any possibility of recourse against Corinthian.

247.    Investors received false information regarding the use of the proceeds of their investments. The written investment materials stated that funds invested would be used primarily to fund the purchase of receivables. In truth, an increasing majority of funds raised from investors was used to pay redemptions and interest payments to other investors.

248.    The AIOF-II PPM dated October 1, 2014, falsely omitted from its description of the "Use of Proceeds" any mention of Aequitas' intent to use investor funds to repay other investors. Instead, the AIOF-II PPM falsely stated that investor funds would be used to finance ACF's "purchase of portfolios of Credit Strategy Receivables," which the AIOF-II PPM defined to include "Consumer loans," "Small business leases or loans," "Real estate financing loans," "Healthcare receivables," "Education receivables," "Corporate loans," and "Transportation backed leases or loans."

249.    The October 31, 2014 PPM issued by AIOF-II in connection with the sale of AIOF-II Senior Secured Promissory Notes includes a Directory that identifies Tonkon as AIOF-II's legal counsel and Deloitte as AIOF-II's auditor. This PPM contained numerous untrue statements of material fact (and omissions of material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading), including the following:

    a. Under the heading of "About the Fund," the PPM disclosed that AIOF-II "will invest in promissory notes issued to the [AIOF-II] by Aequitas Commercial Finance, LLC (the "Member") or applicable SPE, on senior or subordinated terms, as determined by the Manager in its sole discretion" (page 9). This disclosure was materially false and

misleading because it failed to disclose that the promissory notes issued by ACF would be partly or wholly unsecured because ACF was insolvent, and its reported assets were materially overstated;

b. The disclosures that "with a team of industry experts and years of experience in these markets, the Manager believes that [AIOF-II] is well-positioned to take advantage of the credit strategies' currently favorable market conditions" (page 10); that "Aequitas has established itself within large and inefficient credit markets such as education, healthcare, and private credit, where it provides unique financing solutions to companies and their consumers through its proprietary platforms" (page 10); and that AIM's CEO and various other professionals employed by AIM, had "complementary skills and extensive experience relevant to making and managing the investments and financial operations of" AIOF-II (page 20) were materially false and misleading because Aequitas had no real expertise in this area and had failed miserably. Further, these disclosures were materially false and misleading because they omitted the material facts that AIM and its principals had a track record of numerous and substantial business failures, as described more fully in Section IV(A), supra;

c. The PPM made various disclosures regarding its security interest in the assets purchased by ACF, including that: (1) "the Senior Notes are secured by a first priority security interest in all assets of AIOF-II" and any security in ACF's underlying assets granted pursuant to AIOF-II's purchase of ACF's promissory notes (page 17); and (2) that AIOF-II accomplishes a security interest by " investing in Promissory notes issued [AIOF-II] by ACF and the SPEs that are originating or participating (taking a pari passu or subordinate position) in the financing of receivables, consumer and commercial loans and leases, often at discounted prices, through the Aequitas platform" (page 10); and (3)

"By structuring the purchase of the loans at a significant discount which provides substantial over-collateralization, Aequitas is able to mitigate the risk of a school not meeting its obligation to repurchase severely delinquent loans." (page 11). These disclosures were materially false and misleading because they omitted and failed to disclose that a material proportion of ACF's underlying collateral was education loans to students of the now-defunct Corinthian Colleges, rendering ACF insolvent, and the security interest in its assets worthless. Referring to the notes issued by AIOF-II as "secured" is misleading for the same reasons;

d. The disclosure that "[AIOF-II] follows a value investing approach by financing the purchase of receivables or debt assets that [AIOF-II] believes have an intrinsic worth that is undervalued by the market" (page 10);

e. The disclosure on page 32 that AIOF-II "is not obligated to register the Secured Notes and does not intend to do so" is misleading because it omitted to disclose the corresponding risk to investors if the AIOF-II Notes did not comply with the exemption requirements under the Securities Acts and applicable state laws, including the risks that: (i) each purchaser would have the right to rescind its purchase of the AIOF-II note; (ii) refunding all such rescission requests would cause AIOF-II to face severe financial demands and reputational harm that could materially adversely affect its business and operations; (iii) AIOF-II would be subject to significant fines and penalties imposed by the SEC or state regulators; and (iv) additional remedies to purchasers could be available under applicable state law;

f. The disclosures on page 32 that sales of the Senior Notes would be made by the Manager and by broker-dealers who are members of FINRA, and that the Manager "may pay selling commissions to registered broker-dealers" (page 32) were materially false and

misleading because they omitted and failed to disclose that the Senior Notes were being

sold through "finders" who were paid fees in spite of not being licensed as broker dealers

or agents, in violation of securities laws, which subjected AIOF-II to significant potential

penalties, including allowing investors who purchased Senior Notes in transactions in

which finders' fees were paid to have the right to rescind their purchases and subjecting

AIOF-II to additional liability under state and federal laws; and

       g. The PPM disclosed certain "risks" that might arise at some unknown future

date including the "risk of loss to bankruptcy or failure of counterparties" (Appendix A,

page 4); that "obligors may default" (Appendix A, page 8); "there is no guarantee that

[ACF's] proprietary loan selection and valuation models will be successful" (Appendix

A, pages 8-9); and "counterparty risks" (Appendix A, page 12). These disclosures of

possible future "risks" were materially false and misleading because the PPM omitted

and failed to disclose that these issues were not merely future contingencies, but had

already occurred.

250.    Investors were not told by Aequitas that they were sending large sums of money

to Aequitas so that Aequitas could meet some of its obligations to prior investors. As the

company's cash flow shortage increased, so did the company's reliance on new investor money

to pay principal and interest to prior investors, and on persuading investors to not redeem their

investments. By 2014, virtually all new investor money was used by Aequitas to satisfy

obligations to prior investors and to pay Aequitas' operating costs, including lavish expenses and

salaries. Almost no investor money was being used for the stated purpose of the investments—to

purchase new receivables assets.

251.    Even after it knew that it was insolvent, Aequitas continued selling securities to

new investors and persuading prior investors to re-invest. Aequitas raised approximately $350

million from investors between January 2014 and January 2016, including all of the investments made by Plaintiffs in this action.

## III.    THE COLLAPSE OF AEQUITAS

252.    From 2011 through 2014, Aequitas purchased hundreds of millions of dollars of Corinthian student loans, hitching Aequitas's survival to Corinthian's.

253.    At the end of 2010, Aequitas reported that it owned $2.7 million in healthcare receivables and no student loan receivables. By the end of 2011, these reported amounts had increased to $40.2 million in student loan receivables, compared with $19.6 million in healthcare receivables. One year later, Aequitas's outstanding student loan receivables had exploded to reportedly $124.8 million, compared with $27.9 million in healthcare receivables, a ratio of nearly 4.5 to 1. And at the end of 2013, Aequitas reported that it was carrying $153.5 million in Corinthian student loan receivables compared with only $12.4 million in healthcare receivables. Heading into 2014, Aequitas was 12 times more concentrated in student loan receivables than healthcare receivables.

254.    Aequitas acquired most of the student loan receivables through ASFG, LLC, and CSF. Corinthian agreed to pay Aequitas a "discount" fee on each loan, and the parties' recourse agreement required Corinthian to buy back loans that were delinquent for 90 days.

255.    Starting at least as early as 2010, Corinthian became the subject of public scrutiny, raising serious concerns about Corinthian's future:

• In 2010, the U.S. Government Accountability Office (the "GAG") investigated and testified at congressional hearings regarding the student recruitment and enrollment practices employed by for-profit colleges. The GAG released a report in 2010 that publicized its findings that such colleges—which included Corinthian—used "fraudulent practices" and encouraged applicants to falsify their financial-aid forms.

• At least as early as 2012, state attorneys general had joined Congress in investigating illegal business practices at Corinthian and other for-profit colleges. Regulators warned that such a high percentage of students at these schools were experiencing difficulty paying off their loans that the schools could lose access to federal student aid.

Corinthian's students were among the worst, defaulting at a rate that was 64 percent higher than the industry average.

• A U.S. Senate investigation in 2012 was particularly critical of Corinthian. The report stated, "[I]t is unclear that Corinthian delivers an educational product worth the rapidly growing Federal investment taxpayers and students are making in the company." The public report further added that "[i]t is unclear whether taxpayers or students are obtaining value from the $1.7 billion investment that taxpayers made in Corinthian in 2010."

• The news media reported extensively regarding Corinthian's predatory tactics and the growing regulatory pressure. Investors had also taken notice. From April 2010 to April 2013, Corinthian's share price plunged nearly 90 percent.

• By at least as early as June 2013, the SEC was investigating Corinthian's business practices, defaults on student loans, and compliance with U.S. Department of Education financial requirements.

• Corinthian lost over $120 million between June 30, 2011, and June 30, 2013.

256.    Meanwhile, Aequitas was experiencing its own significant developments,

including the following

• On information and belief, Aequitas's collection rate on student loan receivables declined drastically from 2012 to 2013.

• Aequitas was defending two lawsuits filed by its partner in the student loan financing business, American Student Financial Group, Inc., which claimed that Aequitas had breached agreements and engaged in other wrongdoing in connection with an agreement to finance Corinthian student loans. (Tonkon represented Aequitas in this litigation.)

• Several key managers and professionals abandoned Aequitas, including managing director Thomas Sidley, chief operating officer Steve Hedberg, and assistant general counsel Jessica Morgan.

• In 2012, EisnerAmper, then Aequitas's auditor, internally questioned Aequitas's ability to continue as a going concern. In an internal memo, EisnerAmper noted that Aequitas's primary fundraising vehicle, ACF had a net operating loss for 2010, was owed $78 million from its parent Aequitas Holdings, LLC ("Holdings") whose only asset was ACF and was "heavily reliant" on new investor funds to sustain its operations and continue the illusion that Aequitas was a safe and secure investment.

• Aequitas changed its auditors from EisnerAmper to Deloitte. Deloitte, which obtained EisnerAmper's audit work papers, should have shared its doubts that Aequitas could continue as a going concern. Although ACF's financial condition had not improved,

Deloitte apparently raised no doubts about ACF's ability to continue as a going concern, and Aequitas disclosed no such doubts to investors.

• Aequitas formed new entities to attract more investor money, including AIOF-II, ACOF and APCF.

257.    At least as early as August 2012, Corinthian reported to investors that "[t]otal losses associated with the program recourse [student loan receivables agreement with Aequitas], inclusive of the discount paid to ASFG, are estimated to be approximately 50% of the amount funded." In other words, Corinthian forecasted that it would have to spend tens of millions of dollars buying back loans from Aequitas that were made to delinquent borrowers.

258.    On June 10, 2014, Corinthian defaulted on its obligations to ACF and Aequitas.

259.    On July 3, 2014, the U.S. Department of Education issued a press release announcing its imposition of certain conditions on Corinthian while "Corinthian works to either sell or close its campuses across the country in the next six months."

260.    On September 16, 2014, the U.S. Consumer Financial Protection Bureau sued Corinthian for misrepresenting job placement data and violating debt collection laws.

261.    Aequitas purchased only $8.2 million in student loan receivables during all of 2014, a 92% decline from the prior year. Despite this dramatic drop in new student loan receivables purchases, Aequitas continued to aggressively market its investment products throughout 2014 and 2015, touting its diversification and "substantial over-collateralization" of student loan receivables.

262.    On May 4, 2015, Corinthian filed for bankruptcy.

263.    On information and belief, by 2014 at the latest, Aequitas was using most of the investor proceeds it received to pay other investors and to cover operating expenses rather than using money from investors to purchase credit receivables. On information and belief, ACF

invested only 25 percent of investor money in income-generating assets during 2014 and only 8 percent during 2015.

264.    In 2015, Aequitas had over $220 million in debt to investors coming due. Rather than adjusting its valuations and acting to inform and protect its investors, Aequitas persuaded investors to extend or roll over their investments. Aequitas misled investors about the health of Aequitas's business, convincing investors to extend the maturity date of their notes in exchange for additional interest payments. When Aequitas began missing interest payments in 2015, it provided false explanations and vague commitments to delay or make up the missed interest payments.

265.    Throughout 2014, 2015, and early 2016, Aequitas continued to sell securities by touting its investment strategies in credit markets, including Corinthian's student loan receivables.

266.    By at least as early as June 2015, the SEC was investigating Aequitas.

267.    On February 2, 2016, ACF sent a letter to investors informing them that ACF had not been able to satisfy redemption requests since November 2015 and was preparing to liquidate ACF's assets.

268.    On February 8, 2016, ACM disclosed that it had retained FTI Consulting (a forensic and investigative financial consulting firm) to take over management control of the portfolio and to advise on financial matters and potential restructuring of the Aequitas entities.

269.    On February 16, 2016, Aequitas told Oregon state officials that it intended to lay off 80 employees and told each of these employees that the "layoff is intended to be permanent in nature."

270.    On March 10, 2016, the U.S. Securities and Exchange Commission filed suit in this District against Aequitas, Jesenik, and Oliver charging them with securities fraud in

connection with their sales of securities. Soon thereafter, the SEC and the Aequitas entity defendants asked the Court to appoint Ronald Greenspan of FTI as receiver for the Aequitas entities.

271.    On March 16, 2016, the U.S. District Court for the District of Oregon placed Aequitas in receivership.

## IV.    DEFENDANTS WERE INSTRUMENTAL IN AEQUITAS' SALE OF AIOF-II SECURITIES

272.    Defendants' participation and assistance to Aequitas, including AIOF-II, AIM, and ACF, was critical to Aequitas's solicitation and sale of interests in AIOF-II to plaintiffs, which necessarily included, among other things, the formation of the Aequitas entities and affiliates; preparation of PPMs, promotional materials, and quarterly reports; preparation of agreements with investors, affiliates, partners, and other Aequitas entities; the design and performance of audits; the preparation of audited financials, valuations, and other financial information provided to investors; legal and accounting advice relating to the operation of the various Aequitas entities; legal advice relating to compliance with securities laws, including registration requirements; and general legal and accounting advice relating to risks and obligations surrounding the Aequitas operation.

273.    Through their assistance with these and others matters, Deloitte, Tonkon, Sidley and Integrity participated in and materially aided Aequitas's sales of interests in AIOF-II to plaintiffs. Aequitas's ability to hold out these professionals as its auditors, legal counsel, advisors, and business partners in the PPMs and promotional materials provided to investors, and in communications with plaintiffs and other investors, was sufficient alone to give Aequitas the perception of credibility and quality that induced investors to entrust their substantial investments to Aequitas. Examples of each professional firm's involvement are alleged below.

### *Deloitte*

274.     As Aequitas advertised in its PPMs, promotional materials, and audited financial statements, Deloitte served as the "auditor/tax advisor" for AIOF-II and other Aequitas companies, including ACF, ACOF, AIOF and APCF, from the fall of 2013 to at least mid-2015.

275.     ACF's PPMs provided financial information with the headings "Audited," "INCOME STATEMENT," and "BALANCE SHEET" that included financial data derived from Deloitte's 2013 ACF audit.

276.     By assuming the professional responsibilities of Aequitas's independent auditor, Deloitte undertook an obligation to ensure that its audits and audit reports complied with applicable industry standards, including requirements governing the design and performance of its audits; the audit of valuations; the inclusion of notes and adequate disclosures in Aequitas's financial statements; and the obligation to evaluate and consider the need for a going concern qualification. Deloitte was also obligated to ensure that it was and remained independent.

277.     Deloitte explained in an appendix to an engagement letter with Aequitas dated October 10, 2013, that generally accepted auditing standards required Deloitte to conduct an audit to obtain reasonable assurance about whether Aequitas's financial statements were free from material misstatement caused by fraud or error.

278.     In the October 10, 2013, engagement letter, under the heading, "Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites," Deloitte explained that if Aequitas intended to refer to Deloitte in a document, including a PPM, containing audited financial statements as well as other information, "thereby associating D&T with such document," Aequitas agreed to "provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed." Nearly

identical language appeared in Deloitte's engagement letter with Aequitas dated September 8, 12 2014.

279.    Deloitte had copies of AIOF-II PPMs and other Aequitas's PPMs in its audit work paper files, including PPMs for ACF and ACOF. PPMs in Deloitte's files identified Deloitte as Aequitas's auditor. The ACF PPM in Deloitte's files even identified financial data in the PPM as "Audited." Aequitas used these and similar PPMs to solicit investors and sell its securities. Investors knew that Deloitte was Aequitas's auditor because PPMs identified Deloitte as the auditor.

280.    Deloitte participated and materially aided in the sales of securities by Aequitas beginning no later than September 13, 2013.

a. Deloitte acted as the auditor for numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF; AETC; AEIF; Aequitas CarePayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC. Deloitte audited the consolidated financial statements of ACF, which encompassed ACF as well as the following Aequitas entities: CarePayment, LLC; CP Funding I, LLC; CA Medical, LLC; Campus Student Funding, LLC; Destination Capital Equipment Finance, LLC; The Hill Land Company, LLC; EC Hangar, LLC; Aequitas North American Finance, Inc.; Aequitas Equipment Finance, LLC; CP Leverage I, LLC; CSF Leverage I, LLC; Aequitas CarePayment Fund, LLC; Aequitas Income Fund, LLC; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF.

b. Deloitte's auditing services enabled the Aequitas group to conduct its securities business as a whole. Deloitte's willingness to audit Aequitas only below the level of Holdings gave Aequitas the freedom it needed to undertake the transfers and transactions with the entities outside the Deloitte-audited fundraising group that allowed it to create

and perpetuate the illusion of financial health. Aequitas needed the stamp of legitimacy provided by a "clean" audit opinion from an established and reputable audit firm in order to attract, secure, and retain investors and their funds. And Aequitas needed the audited annual reports in order to comply with an exception to the standard custody requirements of the Investment Advisers Act of 1940, an exception that allowed Aequitas to continue to raise and use investor funds free of outside scrutiny.

c. Aequitas informed Deloitte that it wished to transition auditing services from EisnerAmper to Deloitte because of Aequitas' desire to have a more prominent audit firm with a national reputation. In addition, Aequitas informed Deloitte that Aequitas was not satisfied with EisnerAmper's industry qualifications, and Deloitte was selected for its qualifications relating to Aequitas' industry. Having Deloitte as the auditor of its securities business gave Aequitas clout with prospective and existing investors, and the Deloitte-audited financial statements were a material part of the information made available to prospective and existing investors. Deloitte replaced EisnerAmper as Aequitas' auditor no later than September 12, 2013. Prior to then, in June of 2012, EisnerAmper concluded in a memorandum that there is a "substantial doubt about ACF's ability to continue as a going concern." EisnerAmper raised four concerns: (i) ACF had a net operating loss in 2010, (ii) ACF's net income for 2010 was entirely attributed to an $8.3 million paper gain based on an accounting option to value the student loan portfolio without any discount for the substantial risk of default; (iii) ACF was owed $78 million from its parent, members of management, and affiliated entities and (iv) ACF was heavily reliant on new investments to fund operations. (Aequitas had disclosed that funds could be used to "to provide lines of credit for investment funds managed by affiliates of the Company and other general corporate purposes," but nothing in any PPMs disclosed

anything about using investor money to make advances to "members of management."
Loans to insiders are so problematic (material) that they are generally prohibited in the
case of publicly-traded companies. 15 USC § 78m(k) ("It shall be unlawful for any
issuer…, directly or indirectly, …to extend or maintain credit…in the form of a personal
loan to or for any director or executive officer (or equivalent thereof) of that issuer.").
Deloitte obtained EisnerAmper's audit work papers and should have shared its doubts
that Aequitas could continue as a going concern. Despite this, Deloitte prepared
unqualified audit opinions for Aequitas in 2013 and 2014. These opinions were
referenced and summarized in the Aequitas offering documents. From 2013 until
Aequitas was shut down by the SEC, Deloitte participated and materially aided in the
sales of interests in Aequitas securities to plaintiffs and others that are at issue in this
action.

      d. Aequitas provided the financial statements audited by Deloitte to prospective
and existing investors who were deciding whether to invest or re-invest in Aequitas
securities. For example, AIM's Form ADV Part 2A (the firm disclosure brochure) dated
March 24, 2014, stated:

> Each year, each of our Funds delivers to its investors the previous year's audited
> financial statements, including a balance sheet, an income statement, and a
> statement of investors' capital. An independent accounting firm that is registered
> with and subject to inspection by the Public Accounting Oversight Board audits
> our Funds' annual financial statements.

Deloitte was aware that Aequitas was subject to this requirement and that the audited
financial statements would be used in this way and for this purpose.

      e. Deloitte's working papers acknowledge that SEC rules required the distribution
of audited financials and that the audited financials would be used by potential and
current investors. f. Aequitas identified Deloitte as the auditor in the PPMs for various

Aequitas securities, as alleged herein. Aequitas also identified Deloitte as the auditor for the Aequitas Funds in public disclosures filed with the SEC. Deloitte is identified as auditor in the Form ADVs (Part 1A) filed by AIM with the SEC dated March 24, 2014; May 27, 2014; and March 31, 2015.

g. Aequitas could not have continued to sell securities without Deloitte's annual audits, nor could Aequitas have continued to sell securities without distributing the annual Deloitte-audited financial statements to investors.

h. Deloitte was identified as auditor in marketing materials for Aequitas securities, and Deloitte approved Aequitas forwarding its contact details to potential investors conducting due diligence.

281.    After commencing its audit of Aequitas in the fall of 2013, Deloitte issued an "Independent Auditors' Report" dated May 23, 2014, that included consolidated financial statements for AIOF-II and the following additional entities: ACF; AIOF; Aequitas CarePayment Fund, LLC; Aequitas Income Protection Fund, LLC; ACOF; Aequitas North American Finance, LLC; CarePayment, LLC, and its subsidiary CP Funding I, LLC; CA Medical, LLC; Campus Student Funding, LLC; CP Leverage I, LLC; CSF Leverage I, LLC; Destination Capital Equipment Finance, LLC; EC Hanger LLC; MotoLease Financial, LLC; and Hill Land Company, LLC.

282.    Aequitas's audited financial statements, included as part of Deloitte's report dated May 23, 2014, address the financial condition of the Aequitas entities; Aequitas's investment in credit receivables (including student loan receivables); related-party relationships and transactions; and the valuation of ACF's assets, including the credit receivables, ACF's loans, and its equity interests.

283.    Aequitas's financial statements for fiscal year 2013, audited by Deloitte, also include a risks and uncertainties section. Under the subheading "Concentration risk," Aequitas disclosed that approximately percent of Aequitas's healthcare receivables originated from only 5 of the 27 healthcare facilities that sold those receivables to Aequitas. No note is made regarding Aequitas's concentration in student loan receivables.

284.    Deloitte's audit report included Deloitte's independent opinion that ACF's consolidated financial statements "present fairly, in all material respects, the consolidated financial position of [ACF] as of December 31, 2013, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America." Deloitte's audit report stated that "the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion."

285.    Deloitte's audit report dated May 23, 2014, also noted the following:

"[T]he consolidated financial statements include investments valued at $257,285,732 (55.6% of total assets) as of December 31, 2013, whose fair values have been estimated by management in the absence of readily determinable fair values. Management's estimates are based on comparable market data, or information provided by the fund managers or the general partners. Our opinion is not modified with respect to this matter.

286.    On May 29, 2015, Deloitte issued an "Independent Auditors' Report" to ACF that included consolidated financial statements for fiscal years 2013 and 2014. The audited financial statements included a "prior period adjustment" because Aequitas had "incorrectly calculated the fair value of its student loan receivables." The audited financial statements also noted that $220,614,727 in senior and subordinated debt would mature in 2015.

287.    Deloitte's audit report dated May 29, 2015, provided its opinion that ACF's consolidated financial statements "present fairly, in all material respects, the financial position of [ACF] as of December 31, 2014 and 2013, and the results of its operations and its cash flows for

the years then ended in accordance with accounting principles generally accepted in the United States of America."

288.    Deloitte's audit report noted that Aequitas's management set the value of 41.9 percent and 55.6 percent of ACF's assets, and Deloitte took Aequitas's word for it.

289.    Under SEC rules, Aequitas was required to provide Deloitte's annual audited financial statements of the various Aequitas funds to investors.

290.    In addition to its audits, Deloitte assisted Aequitas with the preparation of the financial information that was provided to investors through PPMs, promotional materials, and quarterly reports. Deloitte also participated in and assisted with the valuations of ACOF's portfolio companies and the performance metrics information for those companies. This information was included in PPMs and promotional materials that Aequitas used to solicit potential investors and sell securities. Aequitas also touted to investors that Deloitte "reviewed" the valuations. In an October 10, 2013, letter to Aequitas, Deloitte estimated that its audit of "beginning equity balances" would cost $85,000.

291.    On information and belief, in September 2015, Deloitte hired Chelsea Jesenik as an audit associate. Also, on information and belief, she had interned with Aequitas during 2013. Ms. Jesenik brought any knowledge she had developed of Aequitas's operations with her to Deloitte.

292.    Deloitte had an obligation to review Aequitas's ability to continue as a going concern. Deloitte was obligated to include a going concern qualification in its opinion of Aequitas's financial statements if Deloitte had substantial doubt regarding Aequitas's ability to continue for one year.

293.    Deloitte estimated that its audit fee for 2013 would be $900,000, not including "[e]ngagement-related expenses."

294.    Deloitte estimated that its audit fee for 2014 would be $1,267,000, not including "[e]ngagement-related expenses."

***Tonkon***

295.    As Aequitas advertised in its PPMs, Tonkon served as legal counsel for ACF and AIOF-II at all relevant times. In addition, it served as counsel to ACM, including service as defense counsel in the lawsuit filed against Aequitas by American Student Financial Group, Inc.

296.    On information and belief, Tonkon provided legal services to other Aequitas entities. Tonkon had "extensive experience representing companies, underwriters, borrowers, lenders, investors, private investment firms, private equity firms and venture capitalists in public offerings, commercial loans and private placements of debt and equity securities."

297.    On information and belief, Tonkon participated in and assisted with company formation and governance; legal advice relating to the operation of AIOF-II, CarePayment Founders Fund, ACF, ACM, and Aequitas Management, including legal compliance issues; and the drafting and modification of PPMs, subscription agreements, promissory notes, and other documents related to the sale of Aequitas securities, including the ACF Notes and the AIOF-II Notes.

298.    On information and belief, in the course of advising Aequitas, Tonkon reviewed, or reasonably should have reviewed, Aequitas's audited financial statements.

299.    By undertaking the professional responsibilities of legal counsel to ACF, ACM, AIOF-II, and Aequitas Management, Tonkon had an obligation to familiarize itself with Aequitas's securities offerings and sales methods along with information that Aequitas reported in PPMs, offering materials, and promotional materials.

300.    Tonkon participated and materially aided in the sales of securities by Aequitas beginning no later than June 9, 2010.

a. Tonkon provided legal services to Aequitas in connection with the sale of its securities, including through ACF; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF, and prepared legal papers necessary for Aequitas to complete the sale of its securities, including through ACF; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF.

b. Tonkon provided a legal opinion, dated June 21, 2011, regarding ACF's qualification for an exemption from the Investment Company Act of 1940. Absent an exemption, unregistered investment companies cannot engage in any business in interstate commerce, or control any company engaged in interstate commerce. Tonkon opined that ACF appeared to be in compliance, but cautioned Aequitas to seek guidance from the SEC, which Tonkon knew that Aequitas did not do.

c. Tonkon is identified as legal counsel in the Directory of various PPMs for Aequitas securities, as alleged herein. Tonkon drafted these PPMs and had copies of these PPMs in its files.

d. Tonkon provided legal services to AIM in connection with AIM's role as an SEC-registered investment advisor and the manager of numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF (through its role as manager of ACOFGP); AETC; AEIF; APCF; Aequitas CarePayment Founders Fund, LLC; Aequitas CarePayment Fund, LLC; Aequitas Catalyst Fund, LLC; Aequitas Commodities Fund, LLC; Aequitas Hybrid Fund, LLC; Aequitas Income Fund, LLC; Aequitas Insurance Fund I, LLC; and Aequitas WRFF I, LLC.

e. When Aequitas sought to retain Deloitte in order to have a more prominent audit firm, Tonkon vouched that it could "see no reason why [Deloitte] wouldn't want to be associated with Aequitas."

301.    In or about December 2013, Tonkon hired Jessica Morgan, Aequitas's assistant general counsel. While working at Aequitas, Morgan advised the company about investment advisor and investment company compliance, governance, and regulatory matters for new funds and products. Morgan brought the extensive knowledge she had developed of Aequitas's operations with her to Tonkon. It appears Ms. Morgan's hiring was prior to the formation of AIOF-II.

302.    In or about December 2015, Tonkon hired another assistant general counsel at Aequitas, David Myers. Myers also brought the knowledge he had developed of Aequitas's operations with him to Tonkon.

### *Sidley*

303.    As Aequitas advertised in its PPMs, Sidley served as the corporate counsel for ACM and AIM from at least 2012 to 2016. Sidley acted as the corporate counsel for ACOF from 2014 to 2016. Sidley was also legal counsel for Aequitas Capital Opportunities GP, LLC ("ACOGP"), the general partner of ACOF.

304.    Sidley participated and materially aided in the sales of securities beginning no later than April 5, 2013.

a. Sidley's initial engagement letter dated March 1, 2012, identifies ACF as Sidley's general client in all matters. Sidley provided legal services to ACF and other Aequitas entities in connection with the sale of its securities.

b. Sidley prepared legal papers necessary for Aequitas to complete the sale of its securities.

c. Sidley prepared offering documents required for Aequitas to complete the sale of its securities, including ACOF securities. As reflected on invoices, Sidley billed Aequitas more than $350,000 for its services relating to the ACOF securities offering, including the following services: Drafting PPMs and at least three supplements thereto,

drafting subscription documents, drafting the administration agreement, drafting marketing materials, drafting the term sheet, revising the pitch book, drafting the fact sheet, and drafting the fund limited partnership agreement.

d. The PPMs for ACF securities identified the issue of compliance with the Investment Company Act as a material issue. EisnerAmper, and later Deloitte, also identified this material issue. As a result, the auditors required Aequitas to obtain legal opinions confirming Aequitas' compliance with the Investment Company Act. In response to EisnerAmper, by Memorandum dated April 5, 2013, Sidley provided a written opinion and analysis confirming ACF's compliance. Without this legal opinion, EisnerAmper would not have issued a clean audit opinion and Aequitas would not have been able to sell securities.

e. Aequitas, Deloitte, and Sidley knew, at the end of 2014, that ACF did not comply with the exemption it had relied upon to avoid registration under the Investment Company Act. SEC rules provide a one-year transition period to regain compliance with the Investment Act of 1940. Sidley advised Aequitas how to regain compliance, and Deloitte relied on this fact in proceeding with its audit engagement. Deloitte also relied on Sidley's repeated assurances with respect to the SEC investigation of Aequitas, an investigation that Sidley disclosed to Deloitte in May 2015.

f. Sidley advised Aequitas how to structure its arrangement with Integrity so as to enable Integrity to act as an aggregator of individual investments in an effort to circumvent the Investment Company Act. Integrity became involved with Aequitas in connection with AIPF. Integrity told Aequitas that they could create a structure using a trust (having IBAT, a general partnership, as nominee) that would allow Integrity to act as a pass-through for many different investors that would count as only one investor for

purposes of the exemption from the Investment Company Act on which AIPF relied. Under this arrangement, Integrity would count as a single investor against the maximum allowable 99 investors. Aequitas and Sidley learned that Integrity was wrong and, in July 2014, Aequitas informed the SEC that AIPF failed to satisfy the exemption, and Aequitas proceeded with the process of liquidating AIPF. During 2014, Sidley worked with Aequitas to create a structure that would allow Integrity to do what was originally intended—that is, to act as an aggregator of individual investments—via AIOF-II. AIOF-II was set up specifically for the purpose of retaining AIPF investor money in order to avoid a liquidity crisis, by having the investments in AIPF transfer over to AIOF-II.  As such, Sidley's legal advice was an essential part of the founding and structure of AIOF-II by Aequitas, including AIM and ACF.

g. Sidley was engaged by ASFG LLC, the Aequitas entity that purchased loans from Corinthian, by letter dated July 18, 2012. Sidley also represented CP Lending I, LLC, and its affiliates, entities used by Aequitas to leverage its healthcare receivables, as well as AMLF, which Aequitas used to leverage its motorcycle leases.

h. Sidley provided legal advice to Aequitas regarding what Aequitas called its "Note Manufacturing Program," including advising Aequitas regarding what constitutes a "security" and advice regarding 1940 Act compliance. Sidley advised Aequitas that these notes were not securities and that Aequitas was not required to comply with securities laws as to these notes. Based upon Sidley's legal advice, Aequitas did not provide a PPM or other disclosures in connection with its Note Manufacturing Program and was able to sell the subject securities. In fact, the notes are securities.

i. Sidley provided legal services to AIM in connection with AIM's role as an SEC-registered investment advisor and the manager of numerous Aequitas investment

vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF (through its role as manager of
ACOFGP); AETC; AEIF; Aequitas CarePayment Fund, LLC; Aequitas Hybrid Fund,
LLC; and Aequitas WRFF I, LLC.

      j. Sidley provided other legal services to Aequitas, including legal opinions and
other legal services that enabled Aequitas to isolate its health care receivable assets from
investors and to pledge those assets as collateral securing Aequitas' loan facilities with
Bank of America and Wells Fargo Bank, which promoted the illusion of success and
legitimacy that Aequitas required in order to perpetuate its ongoing efforts to take money
from investors. Among the opinions provided by Sidley was a 2015 opinion to Wells
Fargo regarding ACF's status under the Investment Company Act.

      305.    Aequitas sold securities through AIOF-II, a private fund created by Aequitas for
the purpose of raising money from investors. Sidley served as legal adviser to the manager and
investment adviser of AIOF-II (*i.e.,* AIM). At least as early as 2014, Sidley provided legal
services to AIM, who oversaw the operations and investment decisions of AIOF-II in exchange
for certain management fees and other interests. On information and belief, Sidley advised AIM
with respect to the sale of its securities and prepared legal papers necessary for Aequitas to
complete the sale of its securities, including offering documents, risk disclosures, and
subscription agreements. Sidley prepared these documents with knowledge that Aequitas would
sell the subject securities. The Aequitas securities could not have been sold without the legal
services that Sidley provided.

      306.    By undertaking the professional responsibilities of legal counsel to AIM, ACM,
ACOF, and ACOGP, Sidley had an obligation to familiarize itself with Aequitas's securities
offerings (including AIOF-II) and sales methods along with information that Aequitas reported

in PPMs, offering materials, and promotional materials. On information and belief, Sidley should have familiarized itself with ACF and the ACF assets that Aequitas transferred to ACOF.

307.    On information and belief, Sidley prepared legal opinions and analysis regarding the registration requirements of Aequitas entities and securities and compliance with the Investment Company Act. Specifically, on information and belief, Sidley provided legal advice to Aequitas in connection with isolating certain assets to help facilitate obtaining a line of credit from Wells Fargo, and advised ACF in connection with the manipulation of the valuation of the Holdings Note to satisfy regulatory requirements. These legal opinions and analysis allowed Aequitas to obtain and maintain financing and lines of credit from financial institutions, enabling Aequitas to continue to sell securities and conceal the matters alleged above.

### *Integrity*

308.    Integrity provided substantial and critical aid to Aequitas in the solicitation and sale of interests in AIOF-II to Plaintiffs. Integrity served as Aequitas' agent in the sale of interests in AIOF-II to Plaintiffs, and solicited and facilitated such sales. Indeed, Plaintiffs' AIOF-II purchases were made through Integrity. Integrity distributed subscriptions agreements for AIOF-II to Plaintiffs and accepted and signed these subscription agreements on Aequitas behalf.

309.    Integrity's services on behalf of and in support of Aequitas in the sale and distribution of AIOF-II, were conducted pursuant to an Administrative Services Agreement it entered into with AIOF-II, effective October 15, 2014. Pursuant to this agreement, Integrity was Aequitas' agent in connection with all of the transactions made thereto. Integrity also expressly agreed to use subscription agreements approved by AIOF-II and to provide support services to AIOF-II investors, including serving as point of contact for any questions AIOF-II investors had.

310.    Pursuant to the Administrative Services Agreement, Integrity employees, including Vice President Eric Davis, conducted numerous phone calls with AIOF-II investors and potential investors to answer questions or concerns they had about the AIOF-II product. Integrity repeatedly reassured AIOF-II investors and potential investors that it was meeting regularly with Aequitas about the AIOF-II investment, including reviewing financial statements, and also ensuring that the collateral for AIOF-II notes was secure.

311.    Integrity distributed numerous fact sheets, brochures, presentations and other written materials concerning the AIOF-II investment to potential investors which were co-branded with Aequitas and contained the Aequitas and Integrity logos side-by-side. One such fact sheet distributed by Integrity in 2015 boasted that "[t]he management teams at Aequitas and Integrity Bank & Trust [we]re working diligently to create [the] new investment vehicle" that would become AIOF-II. This fact sheet also stated that the investment would have "special liquidity terms" and "90-day liquidity."

312.    In addition to serving as Aequitas's sales agent, soliciting and facilitating the sale of AIOF-II, and serving as point of contact to answer and address any concerns AIOF-II investors had, Integrity also served as custodian for AIOF-II, whereby it provided additional services to Aequitas and AIOF-II, and received additional fees for such services.

313.    In short, Integrity was a significant part of Aequitas sales network for AIOF-II and it provided substantial aid to Aequitas in the solicitation and sale of interests in AIOF-II to Plaintiffs.

314.    Integrity participated and materially aided in Aequitas' sales of more than $90 million worth of ACF Notes, AIPF Interests and AIOF-II Notes, beginning no later than December 1, 2011.

a. Integrity participated and materially aided in Aequitas' sales of AIPF Interests.

b. Integrity later acted pursuant to several contracts with Aequitas and promoted the sale of these securities. The first contract is an Aequitas Financial Services Network Partner Subscription Agreement ("Network Agreement") between Integrity and Aequitas Capital Management, effective date of September 20, 2014. The subject network (the "Network") was organized by Aequitas Capital Management ("ACM") and its Aequitas affiliates to sell Aequitas securities. The Network "exists for the benefit of, and offers membership to, independent firms composed of sophisticated financial services professionals, each of whom devotes a significant portion of its activities to marketing to advisors of high net worth and corporate clients." By entering into the Network Agreement, Integrity agreed to "offer the Network." Integrity received Network commissions, labeled referral fees, for referring purchasers to Aequitas or to other Network partners participating in the program to sell Aequitas securities. These commissions were not disclosed to investors. Pursuant to this contractual arrangement, Aequitas provided Integrity with access to Aequitas' confidential business information. The terms of the Network Agreement allowed Integrity to distribute pooled investment vehicles through the Network or with one or more Network partners.

c. The second contract is an Administrative Services Agreement between Integrity and Aequitas Commercial Finance, LLC ("ACF") effective July 21, 2014. Pursuant to this agreement, Integrity purchased ACF Notes from ACF on behalf of Integrity's clients. Integrity and ACF agreed that "each Private Note issued in accordance with this Agreement will be issued on the terms and conditions described in the offering memorandum and offering materials provided by Aequitas." Integrity agreed to provide each prospective investor with the offering documents in the form provided by Aequitas,

and to provide each prospective investor the opportunity to ask questions an obtain

information about the ACF Notes. Integrity expressly acknowledged that "the offer and

sale of the Private Notes will not be registered with the U.S. Securities and Exchange

Commission or any other state regulatory agency." The mechanics of the sales of

securities pursuant to the Administrative Services Agreement were as follows:

> Bank will provide to Aequitas a properly executed subscription agreement,
> and such other documents as may be required by Aequitas, and such
> documents will apply to the future purchase of Private Notes on behalf of
> [Integrity] Bank and its Participating Clients. With respect to Participating
> Clients, Bank will obtain properly executed subscription agreements in a form
> approved by Aequitas and will provide Aequitas with copies of the same upon
> Aequitas' request. …

The Administrative Services Agreement acknowledges that Integrity is Aequitas' agent in

connection with all transactions pursuant thereto. Aequitas agreed to provide quarterly

updates to Integrity as to the status of each ACF Note. Integrity agreed to provide specific

services to purchasers of ACF Notes, including direct support regarding client accounts

and the status of participation in ACF Notes, serving as point of contact for questions

about ACF Notes and Aequitas, preparation of distribution statements and performance

reporting on a monthly or quarterly basis, annual tax reporting and billing support.

    d. The third contract is an Administrative Services Agreement between Integrity

and AIOF-II effective October 15, 2014. Pursuant to this agreement, Integrity purchased

AIOF-II Notes from AIOF-II on behalf of Integrity's clients. Integrity and AIOF-II

agreed that "each IOF II Note issued in accordance with this Agreement will be issued on

the terms and conditions described in the offering memorandum and offering materials

provided by the Fund." Integrity agreed to provide each prospective investor with the

offering documents in the form provided by Aequitas, and to provide each prospective

investor the opportunity to ask questions an obtain information about the AIOF-II Notes.

Integrity expressly acknowledged that "the offer and sale of the AIOF-II Notes will not be registered with the U.S. Securities and Exchange Commission or any other state regulatory agency." The mechanics of the sales of securities pursuant to the Administrative Services Agreement were as follows:

> Bank will provide to the Fund a properly executed subscription agreement, and such other documents as may be required by the Fund, and such documents will apply to the future purchase of IOF II Notes on behalf of [Integrity] Bank and its Participating Clients. With respect to Participating Clients, Bank will obtain properly executed subscription agreements in a form approved by the Fund and will provide the Fund with copies of the same upon the Fund's request. …

The Administrative Services Agreement acknowledges that Integrity is Aequitas' agent in connection with all transactions pursuant thereto. Aequitas agreed to provide quarterly updates to Integrity as to the status of each AIOF-II Note. Integrity agreed to provide specific services to purchasers of AIOF-II Notes, including direct support regarding client accounts and the status of participation in AIOF-II Notes, serving as point of contact for questions about ACF Notes and Aequitas, preparation of distribution statements and performance reporting on a monthly or quarterly basis, annual tax reporting and billing support.

e. A promotional document titled "Aequitas Capital Income Opportunity Fund II" describes an investment opportunity offered by Aequitas Capital. The document states that the security is "Presented by: Integrity Bank & Trust" and provides Integrity's address and telephone and fax numbers. The document states that "Aequitas Capital or 'Aequitas' refers to the entities and activities of Aequitas Holdings, LLC and its affiliates." The document bears the copyright "2014 Aequitas Capital Management." The promotional document describes an "opportunity" to invest in a "value-oriented, diversified private credit fund" that invests in receivables or debt assets "that the Fund

believes have an intrinsic worth that is undervalued by the market;" claims that it offers predictable, stable returns; and touts the "transparency" of the fund and that "Investors have visibility into all Fund assets."

f. Integrity served as the custodian for certain Aequitas fundraising vehicles, including ACF; AIOF; AIPF; ACOF; AEIF; AETC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC.

## DAMAGES

315.    As described above, Plaintiffs each purchased interest in AIOF-II from Aequitas. The total value of purchases for all Plaintiffs was about $56,166,723.

316.    Plaintiffs reserve the right to amend and supplement this Complaint with additional plaintiffs who invested with Aequitas.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS AND EACH OF THEM
### (Violations of Oregon Securities Law - ORS 59.115(1) and (3))

317.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

318.    Interests in securities were sold by Aequitas to Plaintiffs in violation of ORS 59.115(1).

(a)    Within three years before this action was commenced, Aequitas sold unregistered securities in violation of ORS 59.055 and 59.115(1)(a).

(b)    Aequitas executives, including Robert Jesenik, were not licensed under the Oregon Securities Laws and solicited and sold securities in violation of ORS 59.055 and ORS 59.165.

(c)    Within three years before this action was commenced, Aequitas sold securities in violation of ORS 59.135(2) and 59.115(l)(a), by making untrue statements of material facts and by omitting to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

(d)     On and after June 29, 2011, Aequitas sold securities by means of untrue statements of material facts and omission to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of ORS 59.115(l)(b). Plaintiffs did not know of the untruths or omissions and, in the exercise of reasonable care, could not have known of the untruths or omissions.

(e)     Aequitas sold securities, in violation of ORS 59.135(1) and (3) by (a) employing a scheme to defraud investors and (b) engaging in a course of business which operated as a fraud or deceit upon investors.

319.     Defendants Deloitte, Sidley, Tonkon and Integrity are liable pursuant to ORS 59.115(3) because they participated in and materially aided unlawful sales of securities.

320.     Defendant Integrity is liable pursuant to ORS 59.115(3) because it successfully solicited the unlawful sale of securities.

321.     Pursuant to ORS 59.115(2)(a), upon tender of the securities. Defendants are jointly and severally liable for the consideration paid for the securities, plus interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%, less any amounts Plaintiffs received on the securities.

322.     Pursuant to ORS 59.115(10), Defendants should be required to pay the reasonable attorney fees of Plaintiffs.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS DELOITTE, INTEGRITY, SIDLEY AND TONKON
### (Violation of Oregon's Elder Abuse Statute—ORS 124)

323.     Plaintiffs reallege the foregoing paragraphs and incorporate them by reference.

324.        Plaintiffs Karen Anderson, Francis Flaim, Betty Flaim, Stephen Flaim, Colleen Hoblit, Anne McCammon, Donald McGee, William Ohlausen, Carol Paquette, Rick Rehan, George Stoll, Anne Stoll, William Tyson, Virginia Adams, Paul Allen, Ernestine Allen, Peter Anderson, Susan Roeseler, James A Barber, Steve Boyd, John Brill, Alvan Brown, Edward Bulger, Joel Bushman, Gregory Bergere, Barbara Bergere, Barbara Downs, Peggy Eide, Gary Etchells, Kathleen Etchells, Rudolph Faller, Cyrena Faller, Kenneth L Flexer, John Gilson, Carol Gonella, John Gonella, Terrance Grier, Donald Hauge, Max Anton Herde, Charles Edward "Ky" Huggins III, Rollie Hunt, Dolores Johansen, Gregory Karpstein, Victoria Karpstein, Patricia Klink, Robert Klink, Clifford Layock, Myrna Lee Laycock, Irving Levinson, Robert Levinson, Deborah Maloney, John McGinn, Catherine Moeller, Edward Moore, Mary Nicholson, Emily Quan, Donald Ramsthel, Laleh Ramsthel, John Redl, Owen Reese Jr., Daniel Reiner, Allen Reiter, Susan Reiter, Allen Rhyasen, Raymond Ringering, Susan Sabella, Ken Schreier, George Surgent, Christopher Towner, Vijaykumar Vashee, Donald Verkest, Linda Wall, David Whitney and Philip Widmer (collectively, the "Elderly Plaintiffs)" were at all material times vulnerable persons as set forth in ORS 124.100(l)(g) because each of the Elderly Plaintiffs was an elderly person as defined in ORS 124.100(l)(b).

325.        The Elderly Plaintiffs were each entitled to the protections of ORS 124.

326.        As provided in ORS 124.100(4), Aequitas's conduct constituted financial abuse of the Elderly Plaintiffs as set forth in ORS 124.110.

327.        In violation of ORS 124.100(5), defendants Deloitte and Tonkon permitted Aequitas to engage in financial abuse of the Elderly Plaintiffs by knowingly acting or failing to act under circumstances in which a reasonable person should have known of the financial abuse.

328.    Under ORS 124.100(2), defendants Deloitte and Tonkon are liable for an amount equal to three times all economic and noneconomic damages resulting from the financial abuse or $500, whichever amount is greater.

329.    Pursuant to ORS 124.100(2)(c), defendants Deloitte and Tonkon are liable for reasonable attorney fees incurred by the Elderly Plaintiffs.

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.    An award of damages in favor of plaintiffs, under ORS 59.115(2)(a), against all defendants, in an amount to be proved at trial, plus applicable pre- and post-judgment interest, in an amount no less than $56,166,723;

B.    An award of damages in favor of the Elderly Plaintiffs, under ORS 124.100(2), against defendants Deloitte and Tonkon for three times the amount of their economic and noneconomic damages, in an amount no less than $75,283,800;

C.    Reasonable attorney fees under ORS 59.115(10) and 124.100(2)(c);

D.    Plaintiffs' costs and disbursements; and

E.    Any other further relief that the court deems just, equitable, and proper.

///

///

///

///

///

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


DATED this 27th day of November, 2018.

PEIFFER ROSCA WOLF ABDULLAH CARR & KANE


s/Joseph C. Peiffer
Joseph C. Peiffer (admitted *pro hac vice*)
E-Mail:  jpeiffer@prwlegal.com
201 St. Charles Ave., Suite 4610
New Orleans, LA 70170
Telephone No.: (504) 523-2434
Facsimile No.: (504) 523-2464


BEUGELMANS, LLP


s/Daren A. Luma
Daren A. Luma (admitted *pro hac vice*)
E-Mail:  dluma@lumalegal.com
75 South Broadway, Suite 400
White Plains, NY 10601
Telephone No.: (914) 304-4051
Facsimile No.: (914) 206-5353


PARSONS FARNELL & GREIN, LLP


s/Charles J. Paternoster
Charles J. Paternoster, OSB #024186
E-Mail: cpaternoster@pfglaw.com
1030 SW Morrison Street
Portland, OR 97205
Telephone No.: (503) 222-1812
Facsimile No.: (503) 274-7979